740 F.2d 1071
 35 Fair Empl.Prac.Cas. 508, 27 Wage & Hour
Cas. (BN 4,
34 Empl. Prac. Dec. P 34,540, 238 U.S.App.D.C. 400,
101 Lab.Cas. P 34,585
 Mary Pat LAFFEY, et al.,
v.
NORTHWEST AIRLINES, INC., Appellant,
Air Line Pilots Association, Non-Aligned Party. (Two Cases)
Mary Pat LAFFEY, et al., Appellants,
v.
NORTHWEST AIRLINES, INC.,
Air Line Pilots Association, Non-Aligned Party. (Two Cases)
 Nos. 83-1033, 83-1034, 83-1167 and 83-1168.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 8, 1983.
Decided July 20, 1984.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 70-2111).
 Phillip A. Lacovara, Washington, D.C., with whom William R. Stein, Washington, D.C., was on the brief for Northwest Airlines, Inc., appellant in Nos. 83-1033 and 83-1167 and appellee in Nos. 83-1034 and 83-1168.
 Michael H. Gottesman, Washington, D.C., with whom Robert M. Weinberg and Jeremiah A. Collins, Washington, D.C., were on the brief for Laffey, et al., appellees in Nos. 83-1033 and 83-1167 and appellants in Nos. 83-1034 and 83-1168. Julia Penny Clark, Washington, D.C., also entered an appearance for Laffey, et al.
 Before GINSBURG, BORK and STARR, Circuit Judges.
 OPINION PER CURIAMPER CURIAM:
 
 
 1
 This Equal Pay Act-Title VII class action concerns the former practices of Northwest Airlines (NWA) with regard to the employment of cabin attendants. Women employed by NWA in the all-female category "stewardess" received less pay than men in the all-male "purser" category. In addition, NWA required female cabin attendants to share double rooms on layovers while providing single rooms to male cabin attendants; it paid male attendants, but not females, a cleaning allowance for uniforms; and it imposed weight restrictions upon females only.[1]
 
 
 2
 The lawsuit challenging these practices commenced in the summer of 1970 and has been intensely litigated since its inception. District court adjudications were twice appealed at interlocutory stages; in response, panels of this court meticulously reviewed an extensive record. On November 30, 1982, the district court concluded all tasks within its charge and entered final judgment. NWA appealed and plaintiffs cross-appealed.
 
 
 3
 We affirm the challenged rulings in principal part. On the few points on which we do not uphold the district court's determinations, we specify, precisely, the required modification so that adjustments to the final judgment can be calculated without further adversarial contest. Our opinion thus serves as the court's closing chapter in this nearly fourteen-year-old controversy.
 
 I. BACKGROUND
 A. Prior Proceedings
 
 4
 Trial of plaintiffs' multiple charges of NWA violations of the Equal Pay Act, 29 U.S.C. Sec. 206(d) (1982), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e to 2000e-17 (1976 & Supp. V 1981) (Title VII), commenced in late 1972 and concluded in early 1973. In November 1973 findings and conclusions, Laffey v. Northwest Airlines, Inc., 366 F.Supp. 763 (D.D.C.1973) [hereafter, 1973 Findings ], the district court determined that NWA had violated the law in each of the respects alleged in the complaint. Of dominant importance to the monetary relief awarded plaintiffs, the district court found that stewardesses and men serving as pursers performed substantially equal work. The purser/stewardess salary differential, the less desirable layover accommodations for women, and the cleaning allowance limited to men, were held impermissible under both the Equal Pay Act and Title VII; the weight limits for women were declared unlawful under Title VII. In an April 1974 remedial order, Laffey v. Northwest Airlines, Inc., 374 F.Supp. 1382 (D.D.C.1974) [hereafter, 1974 Remedial Order ], the district court decreed injunctive relief and specified back-pay computation formulas. Judgment pursuant to the April order was entered May 20, 1974.
 
 
 5
 Both sides appealed. In a painstaking opinion, released October 20, 1976, a panel of this court affirmed the district court "on all substantive questions of statutory infringement" and "uph[e]ld most but not all the [district] court's specifications on relief." Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 437 (D.C.Cir.1976) [hereafter, Laffey I ]. NWA's petition for rehearing and suggestion for rehearing en banc were denied September 8, 1977; its petition for certiorari was denied February 21, 1978. 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792.
 
 
 6
 When the case returned to the district court, in March 1978, NWA moved for relief from 1974 injunctive provisions, which had been stayed pending appeal and petition for certiorari, requiring it to furnish female cabin attendants single rooms on layovers and cleaning allowances for uniforms. The district court denied NWA's motion, and NWA appealed.
 
 
 7
 Again after careful review, on October 1, 1980, we affirmed the district court's order. Laffey v. Northwest Airlines, Inc., 642 F.2d 578 (D.C.Cir.1980) [hereafter, Laffey II ]. In the process, we observed that the 1974 order, reviewed in Laffey I, did not qualify as a final judgment because the district court had not at that point completed its work and disassociated itself from the case. Id. at 583-84. We noted, however, that the 1974 adjudication, awarding extensive injunctive relief, was appealable of right under 28 U.S.C. Sec. 1292(a)(1) (1982), and that "the permanence and pervasiveness of the order's injunctive provisions enabled review on the merits of all interrelated features of the order save those the District Court had reserved for future adjudication." Id. at 584 n. 49.
 
 
 8
 While clarifying that the 1974 district court adjudication was not a "final decision" within the meaning of 28 U.S.C. Sec. 1291 (1982), we hastened to declare the district court "entirely right," Laffey II, 642 F.2d at 584, in declining NWA's request to modify the injunction; modification would have involved reopening issues already decided by that court and "laid to rest" when we affirmed the district court's directives in Laffey I. Id. at 584-85. We then stated with emphasis impossible to obscure that even if we were convinced of the error of a decision made on an earlier appeal in this litigation, we would adhere to the established "law of the case" absent extraordinary cause to depart from our precedent. Id. at 585-86. Pointedly, we cited the First Circuit's admonition against reconsideration "after denial of petitions for rehearing and certiorari." Id. at 585 & n. 58 (citing Legate v. Maloney, 348 F.2d 164, 166 (1st Cir.1965)).
 
 
 9
 The district court has now resolved all disputed matters in this protracted case. We approach the multiple issues raised by NWA and the three raised by plaintiffs mindful that "[i]f justice is to be served," Laffey II, 642 F.2d at 585, "[t]here must be an end to dispute." Id. (quoting Legate v. Maloney, 348 F.2d at 164, 166 (1st Cir.1965)).
 
 B. Issues on Appeal
 
 10
 We indicate here the order in which this opinion discusses the issues raised by the cross-appeals, and state, summarily, our disposition as to each issue.
 
 1. NWA's Appeal
 
 11
 a. Alleging supervening Supreme Court decisions, NWA asks us to overturn i) the root determination that the purser/stewardess pay differential was based on sex, and ii) the already twice-reviewed determination that the cleaning allowance for men but not women discriminated impermissibly on the basis of sex. Discerning no clear change--indeed no change at all--in the governing law, we adhere to the law of the case on both issues.
 
 
 12
 b. Asserting a flaw in the determination that stewardesses and pursers performed "equal work," double faults in the measurement of backpay, oversights in the delineation of the Title VII class, and error in characterizing the Equal Pay Act violations as "willful," NWA urges alteration of prior dispositions on these questions. In view of the full and fair opportunity NWA had to litigate these issues in the district court and on appeal in Laffey I, we hold that "the strong policy of repose," Laffey II, 642 F.2d at 585, precludes consideration of NWA's earlier rehearsed arguments and more recent afterthoughts.
 
 
 13
 c. As to the Title VII back-pay accrual period, we adhere to the law of the case on the nonretroactivity of that statute's current two-year limitation. However, we modify the district court's specification of a three-year period borrowed from the District of Columbia's minimum wage law or general statute of limitations. Instead, we hold that, in the unique circumstances presented here, the time frame most appropriately borrowed is Minnesota's two-year limitation on "the recovery of wages ... under any federal or state law." Minn.Stat.Ann. Sec. 541.09(5) (West Supp.1982-1983).
 
 
 14
 d. Reviewing the district court's award of liquidated damages under the Equal Pay Act, we conclude that guidance supplied in Laffey I was properly followed and sustain the determination in all respects.
 
 2. Plaintiffs' Cross-Appeal
 
 15
 a. As to credit for service prior to the passage of the Equal Pay Act and Title VII, Laffey I instructed only a "look at the collective bargaining agreement" on remand to determine whether "longevity" rather than "seniority" controlled. 567 F.2d at 476. Our opinion did not contemplate stripping plaintiffs of the pre-Act experience credits that the district court initially allowed them for the limited purpose of calculating the backpay NWA owed for post-Act service. Failure to accord plaintiffs longevity credit for all their days of service to NWA as stewardesses, in determining their post-Act pay level, would impermissibly project into the post-Act period a sex-based differential. We therefore reverse the district court's post-Laffey I ruling on this point and instruct that court to recognize plaintiffs' pre-Act longevity in calculating backpay for the relevant, post-Act, time periods.
 
 
 16
 b. As to interest, the district court properly declined plaintiffs' invitation to revisit the 1974 remedial order provision on the rate of pre-judgment interest. However, no "law of the case" settled the question of post-judgment interest on liquidated damages. That issue ripened on remand after our Laffey I decision. Reviewing the district court's ruling on the merits, we reverse the determination and hold plaintiffs entitled to post-judgment interest on liquidated damages.
 
 
 17
 In sum, we instruct the district court on remand to 1) allow backpay under Title VII beginning two years, not three years, prior to the filing of the first EEOC charge; 2) credit plaintiffs with pre-Act longevity in calculating backpay due for post-Act service; and 3) allow post-judgment interest on liquidated damages. In all other respects, we affirm the district court's dispositions.
 
 
 18
 II. ALLEGED SUPERVENING SUPREME COURT PRECEDENT
 
 
 19
 Laffey I affirmed district court determinations that the purser/stewardess pay differential, and the cleaning allowance for men's uniforms but not women's, violated the Equal Pay Act and Title VII. Supervening Supreme Court decisions, NWA maintains, reveal that those affirmations were wrong. NWA cites County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), as supervening precedent establishing that the purser/stewardess pay differential was lawful, and relies on General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), with regard to the cleaning allowance. Neither High Court decision, we conclude, alters the law earlier applied in this case. We therefore reaffirm Laffey I as the law of the case and of the circuit.[2]
 
 A. The Purser/Stewardess Pay Differential
 
 20
 The alleged supervening decision, County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), resolved this "sole issue": whether female jail guards who did not prove their work equal in skill, effort, and responsibility to the work of male jail guards, and therefore failed to establish an Equal Pay Act violation, could nonetheless challenge their rate of pay as discriminatory under Title VII. 452 U.S. at 166 n. 8, 101 S.Ct. at 2246 n. 8. The Supreme Court answered "yes"; it held that despite complainants failure to satisfy the equal work standard, they could remain in court under Title VII on their charge that the County had set "the wage scale for female guards, but not for male guards, at a level lower than its own survey of outside markets and the worth of the jobs warranted." Id. at 166, 101 S.Ct. at 2246. Title VII, the Court explained, in contrast to the Equal Pay Act, does not bar "claims of discriminatory undercompensation ... merely because [the female complainants] do not perform work equal to that of male [employees]." Id. at 181, 101 S.Ct. at 2254.
 
 
 21
 In imaginative argument, NWA asks us to spy a silver lining for employers in Gunther. NWA urges that the Supreme Court, in the process of rejecting a proffered restricted reading of Title VII, enlarged the scope of the Equal Pay Act's residuary affirmative defense, which permits payment of different wages if "made pursuant to ... a differential based on any other factor other than sex."[3] For purposes of this argument, NWA concedes that pursers and stewardesses in fact performed "equal work" within the meaning of the Equal Pay Act.[4] But grace a Gunther, NWA contends, an employer "who premises a wage differential on his determination that two jobs are different" escapes Equal Pay Act and Title VII liability, "even if that conclusion is later found to be mistaken." Brief for Northwest Airlines, Inc. [hereafter, NWA Brief] at 33.
 
 
 22
 For two reasons we cannot indulge NWA's endeavor to persuade us that Gunther widened the Equal Pay Act's exception for pay differentials "based on a bona fide use of 'other factors other than sex.' " Gunther, 452 U.S. at 170, 101 S.Ct. at 2248 (quoting 29 U.S.C. Sec. 206(d)(1)(iv) (1982). First, NWA's position is incompatible with the statutory design. Under the Fair Labor Standards Act, which Congress adopted as the procedural and remedial framework for Equal Pay Act claims, a court has discretion to disallow, in whole or in part, liquidated (double) damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of t[he Act]." 29 U.S.C. Sec. 260 (1982). NWA contends that an employer's actual but erroneous belief that two jobs are in fact different wholly shelters the employer from equal pay for equal work liability, NWA Brief at 14, 33; that contention is not synchronous with a congressional direction giving judges discretion only to limit, not to eliminate, damages when an employer, in "good faith," erroneously but reasonably believed his conduct conformed to legal requirements.[5]
 
 
 23
 Second, NWA's inflation of the Equal Pay Act's residuary defense to exonerate employers who in fact failed to reward equal work with equal pay, so long as they honestly believed the jobs in question in fact were different, Reply Brief of Northwest Airlines, Inc. [hereafter, NWA Reply Brief] at 3-4, 19, is not sensibly extracted from Justice Brennan's opinion for the Court in Gunther. That decision interpreted Title VII to accommodate sexbased discrimination in compensation claims that did not fit within the equal pay for equal work principle. Specifically, Gunther rejected the argument that the "Bennett Amendment" to Title VII, 42 U.S.C. Sec. 2000e-2(h) (1982),[6] confined Title VII sex-based wage discrimination complaints to claims that could also be brought under the Equal Pay Act. Gunther held that the Bennett Amendment had a more modest design: it simply incorporated into Title VII the Equal Pay Act's four affirmative defenses.[7] The Gunther opinion left untouched governing law on "equal pay for equal work regardless of sex." See Corning Glass Works v. Brennan, 417 U.S. 188, 190, 94 S.Ct. 2223, 2226, 41 L.Ed.2d 1 (1974).
 
 
 24
 NWA features most prominently, see NWA Brief at 28-29, lines clipped from a passage in Gunther in which Justice Brennan focused on the Equal Pay Act's fourth affirmative defense, applicable to differentials "based on any other factor other than sex." 29 U.S.C. Sec. 206(d)(1)(iv) (1982). In this passage, Justice Brennan stated that genuinely non-sex-based factors, for example, "a bona fide job rating system," might be used by an employer in setting compensation, without offense to federal law, even when such factors have a disparate impact on one sex. Gunther, 452 U.S. at 170-71 & n. 11, 101 S.Ct. at 2248-2249 & n. 11.
 
 
 25
 Basing wages on "a bona fide job rating system"--a sex-neutral, objective measure--exemplifies the legitimate employer conduct Congress envisioned as a permissible "use of 'other factors other than sex,' " Gunther explained. Id. NWA, however, employed no "bona fide job rating system" or other sex-neutral, objective standard[8] in setting wage rates for pursers and stewardesses. The passage NWA clips, read in its entirety, contains no suggestion that Congress also envisioned as a bona fide "other factor" an employer's mere belief, untested by any objective job rating system, that men and women are not engaging in equal work. Indeed, a fair reading of the passage indicates just the opposite.[9]
 
 
 26
 Gunther, in the portion featured by NWA, addressed only the impact Equal Pay Act affirmative defenses might have on "the outcome of some Title VII sexbased wage discrimination cases." Gunther, 452 U.S. at 170, 175 n. 14, 101 S.Ct. at 2248, 2250 n. 14. NWA, however, maintains that the Court's discussion should be read to augur incorporation of a line of Title VII "disparate treatment" decisions into Equal Pay Act law.[10] Even if we could find in Gunther the between-the-lines dictum NWA ascribes to the Court, NWA's argument for exoneration from equal pay liability would not succeed.
 
 
 27
 The Title VII decisions NWA cites unexceptionally involve situations in which the employer did not classify jobs overtly by sex (or race). E.g., Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In that setting, where sex-based categorization, if it exists, is covert, the Court has elaborated rules for establishing discriminatory intent or the lack thereof. This case, however, involves overt sex classification--explicitly disparate treatment. Purser jobs were reserved for men only; the stewardess class was all-female.[11] NWA has cited no case, nor do we know of any, suggesting that a Title VII or Equal Pay Act plaintiff must demonstrate, beyond sex-segregated job classifications and unequal pay for equal work, the employer's evil mind--in NWA's words, "disparate treatment" that proceeds from "discriminatory animus" or a "bad-faith attempt to evade the law." NWA Brief at 14, 39.
 
 
 28
 In sum, so far as we can tell, neither Congress nor the Court has ever entertained the notion that an employer who intentionally classifies jobs by sex, and in fact pays women less for the same work, can achieve exoneration by showing he sincerely thought the jobs he separated by sex were different. But see NWA Brief at 33; NWA Reply Brief at 3-4, 19. Justice Brennan's opinion in Gunther, it is certain, establishes no such novel law. Where, as here, there is an actual intent to separate jobs by sex, and the employer is found in fact to have paid women less for equal work, all precedent in point indicates that disparate treatment is solidly established.[12]
 
 
 29
 In Goodrich v. International Brotherhood of Electrical Workers, 712 F.2d 1488, 1493 n. 11 (D.C.Cir.1983), we noted that the Equal Pay Act's residuary defense covering "factors other than sex" affords no "convenient escape from the Act's basic command." Unless and until Congress or the Supreme Court declares otherwise, our dominant guides remain the command that "equal work will be rewarded by equal wages," S.Rep. No. 176, 88th Cong., 1st Sess. 1 (1963), and the instruction that the Equal Pay Act is a "broadly remedial" statute targeting an "endemic problem of employment discrimination," by firmly establishing as federal law the "principle of equal pay for equal work regardless of sex." Corning Glass Works, 417 U.S. at 190, 195, 208, 94 S.Ct. at 2226, 2228, 2234. NWA's argument, attributing to Gunther a meaning that would substantially reduce the force of the federal equal pay requirement, is artful but unavailing; it fails to elevate from the untenable to the plausible the claim that in Laffey I we incorrectly stated the law governing the purser/stewardess pay differential.
 
 B. The Uniform Cleaning Allowance
 
 30
 Laffey I affirmed the district court's determination that NWA discriminated on the basis of sex by providing a male-only uniform cleaning allowance. 567 F.2d at 456. Laffey II held a second challenge to the district court's ruling on the cleaning allowance unwarranted by any "circumstance capable of generating injustice from adherence to the law of the case." 642 F.2d at 586. Despite the stern "law of the case" analysis and admonition in Laffey II, id. at 585-86, and the court's further statement that it considered Laffey I 's cleaning allowance holding "fully accurate," id. at 586,[13] NWA seeks to continue the fray. It cites General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), and describes that case as an "intervening decision," NWA Brief at 17, although Gilbert issued over two years before Laffey II was argued.[14]
 
 
 31
 Gilbert was a Title VII challenge that turned on the Court's conclusion that the disability program in question did not group persons by "gender as such." Gilbert, 429 U.S. at 134-35, 97 S.Ct. at 407-408 (quoting Geduldig v. Aiello, 417 U.S. 484, 496 & n. 20, 94 S.Ct. 2485, 2492 & n. 20, 41 L.Ed.2d 256 (1974)). The issue was an employer's exclusion of women unable to work due to pregnancy or childbirth from disability benefits. The program did not divide potential recipients by "gender as such," the Court reasoned, because one of the two groups comprised "nonpregnant persons," and thus "include[d] members of both sexes." Gilbert, 429 U.S. at 134-35, 97 S.Ct. at 407-408. In the absence of classification based upon "gender as such," the Court inquired whether there was any "gender-based discriminatory effect." Id. at 137-39, 97 S.Ct. at 408-410. NWA relies on the "discriminatory effect" portion of the Gilbert analysis. NWA Brief at 53.
 
 
 32
 Even in Gilbert itself, however, the Court indicated that "discriminatory effect" analysis should not come into play when the program at issue divides recipients into groups classified by "gender as such." 429 U.S. at 136-37 & n. 15, 97 S.Ct. at 408-409 & n. 15.[15] That is the situation here--all male cabin attendants received a uniform benefit package with a cleaning allowance, all female attendants received a different package without a cleaning allowance.[16]
 
 
 33
 Congress has overruled Gilbert prospectively "to prohibit sex discrimination on the basis of pregnancy,"[17] and the Supreme Court believes Congress "also rejected the test of discrimination [Gilbert ] employed." Newport News Shipbuilding & Dry Dock Co. v. EEOC, --- U.S. ----, ----, ----, 103 S.Ct. 2622, 2627, 2631, 77 L.Ed.2d 89 (1983). In its most recent expression in point, the Court left no doubt that, when classification by sex is undisguised, there is no need to consider, as Gilbert did, "the average monetary value of the [overall benefit package in question] to male and female employees." Id. 103 S.Ct. at 2632 n. 26. Further, the Court quoted with apparent approval the EEOC's position that it is not "a defense under Title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other." Id. (quoting 29 C.F.R. Sec. 1604.9(e) (1983)).
 
 
 34
 In Laffey II, the court described the cleaning allowance "as simply another supplement to male salaries." 642 F.2d at 589. Gilbert presents no occasion for us to study again that twice-studied issue. See id. at 586.
 
 
 35
 III. ADDITIONAL LAW OF THE CASE AND WAIVER ISSUES
 
 
 36
 A. Laffey I Holdings Challenged as "Clearly Erroneous"
 
 
 37
 NWA does not dispute that Laffey I "actually decided" two issues which it now seeks to relitigate: first, that "equal work" was performed by NWA stewardesses and pursers, and second, that NWA, as a matter of law, could have "willfully" violated the Equal Pay Act notwithstanding the absence of an "iniquitous ... state-of-mind." Laffey I, 567 F.2d at 461; NWA Brief at 11 n. 1, 13. NWA seeks to reopen these two issues, not by positing the existence of supervening case law, but by arguing that our prior holdings were "clearly erroneous" and that adherence to law of the case in these instances "would work a manifest injustice." Melong v. Micronesian Claims Commission, 643 F.2d 10, 17 (D.C.Cir.1980) (quoting White v. Murtha, 377 F.2d 428, 432 (5th Cir.1967)).[18] Because we perceive no error whatever in Laffey I 's disposition of these two issues, let alone the "clear" error and "manifest injustice" that would warrant departure from the law of the case, we reject NWA's arguments and reaffirm the holdings of Laffey I with respect to the issues of equal work and willfulness.
 
 
 38
 Moreover, we take this opportunity to emphasize that this court will not, absent truly "exceptional circumstances," Laffey II, 642 F.2d at 585, look favorably on arguments against the law of the case which fall only under the "manifest injustice" rubric.[19] We do not intend to allow this avenue of attack on the law of the case to become an auxiliary vehicle for the repetition of arguments previously advanced, without success, in appellate briefs, petitions for rehearing, and petitions for certiorari.
 
 1. Equal Work
 
 39
 In its 1973 Findings, the district court concluded that the jobs of purser and stewardess at NWA "require equal skill, effort and responsibility and are performed under similar working conditions." 366 F.Supp. at 788, 789 (Findings of Fact (FOF) 78; Conclusions of Law 2, 4). In Laffey I, this court explicitly affirmed this finding and conclusion, 567 F.2d at 453, thus establishing the equal work prerequisite to Equal Pay Act liability as the law of the case.
 
 
 40
 NWA's challenge to this holding hinges on its interpretation of two of the district court's findings of fact in 1973. In one pivotal finding, FOF 65, the district court described the "chain of command" for an NWA flight:
 
 
 41
 If one purser is aboard, he is denominated the Senior Cabin Attendant irrespective of his relative length of service as compared to the other attendants. If two or more pursers are aboard the flight, the most senior purser is the Senior Cabin Attendant. If no purser is aboard the flight, the most senior stewardess or FSA is the Senior Cabin Attendant.
 
 
 42
 1973 Findings, 366 F.Supp. at 785. The nature and scope of a Senior Cabin Attendant's supervisory responsibilities is described in another critical finding, FOF 67:
 
 
 43
 Stewardesses who serve as Senior Cabin Attendant are subject to discipline if they fail to carry out their "supervisory" responsibilities, and are held just as accountable as pursers who fail to carry out their "supervisory" responsibilities.
 
 
 44
 Id. The district court also noted in this latter finding that NWA had no merit pay adjustment whereby either pursers or stewardesses who "supervise" effectively were paid more than less capable or effective supervisors.
 
 
 45
 Seizing upon the district court's recognition in FOF 65, above, that pursers supervised stewardesses, but not vice versa, NWA argues vehemently that the two jobs cannot be deemed "equal" because "[j]obs that entail different degrees of supervisory responsibility are not equal within the meaning of the Equal Pay Act." NWA Brief at 41. Next, relying upon the court's description in FOF 67, above, of the cabin attendants' "accountability" for the discharge of their supervisory duties, NWA maintains that the district court's findings "compel the conclusion that the supervisory responsibility had real content" and that Laffey I 's conclusion that the pursers' supervisory function was "insignificant" thus "actually contradicted the trial judge's findings." Id. at 42.
 
 
 46
 We cannot accept either branch of NWA's argument. It is, of course, elementary that "jobs need not be identical in every respect before the Equal Pay Act is applicable ...." Corning Glass Works v. Brennan, 417 U.S. 188, 203 n. 24, 94 S.Ct. 2223, 2232 n. 24, 41 L.Ed.2d 1 (1974). In Laffey I, this court explained:
 
 
 47
 [T]he phrase "equal work" does not mean that the jobs must be identical, but merely that they must be "substantially equal." A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities.
 
 
 48
 567 F.2d at 449 (citations omitted). This "substantially equal" test, which has been adopted by no fewer than nine other circuits, Thompson v. Sawyer, 678 F.2d 257, 272 n. 12 (D.C.Cir.1982), necessarily implies that there can be job responsibilities--including supervisory duties--so " 'insubstantial or minor' " as not to " 'render the equal pay standard inapplicable.' " Laffey I, 567 F.2d at 449 (quoting 29 C.F.R. Sec. 800.122 (1975)).
 
 
 49
 Therefore, to the extent that NWA's argument suggests that any difference in supervisory responsibility renders jobs unequal, it is manifestly incorrect as a matter of law. Critically, the authority NWA cites as support for this proposition is not, in fact, inconsistent with the "substantially equal" test.[20] Indeed, NWA itself acknowledges several other cases in which supervisory responsibilities were found to be too minor to warrant a finding of unequal responsibility. See Hill v. J.C. Penney Co., 688 F.2d 370, 373-74 (5th Cir.1982); Hodgson v. American Bank of Commerce, 447 F.2d 416, 422 (5th Cir.1971).
 
 
 50
 NWA's claim that Laffey I 's finding of equal work "actually contradicted" the district court's findings is also patently incorrect. As we understand NWA's argument, FOF 67, when read together with FOF 65, "compels" the conclusion that the district court viewed the supervisory responsibilities as not insubstantial. This contention, however, plainly overlooks the district court's express finding that the pursers' supervisory functions "require no greater skill, effort or responsibility than the other functions assigned to all cabin attendants," 1973 Findings, 366 F.Supp. at 786 (FOF 69), and its further explicit finding of equal "skill, effort and responsibility" on the part of stewardesses and pursers, id. at 788-89 (FOF 78; Conclusions of Law 2, 4). It follows as ineluctably as night follows day that the district court found that the pursers' supervisory duties did not alter the equivalence of the two jobs under scrutiny in this case.[21]
 
 
 51
 There is, in cutting through the prolific underbrush planted in our way by NWA, upon analysis no conflict whatever between the district court and this court as to the importance of the supervisory duties assigned to pursers. Laffey I affirmed the district court's finding that "NWA purser and stewardess positions are substantially equal within the intent of the Equal Pay Act...." 567 F.2d at 453. NWA has come forward with nothing to suggest that this affirmance of the district court's conclusion with respect to the importance of supervisory duties was in error. NWA's argument, based ultimately on a tortured reading of the district court's findings and an inaccurate portrayal of the applicable law, fails.
 
 2. Willfulness
 
 52
 Under 29 U.S.C. Sec. 255(a) (1976), a "willful" violation of the Fair Labor Standards Act (FLSA), of which the Equal Pay Act is a part, triggers a three-year, as opposed to the Act's ordinary, two-year statute of limitations. In Laffey I, this court determined that NWA's violation of the Equal Pay Act had been "willful" within the meaning of section 255(a), 567 F.2d at 463, thus rendering NWA liable for a third year of backpay. In reaching this conclusion, the court canvassed the legislative history of section 255(a) and rejected NWA's suggestion that a violation must be animated by a bad purpose or evil intent to be deemed willful. Id. at 461. Instead, the court determined that employer noncompliance with the Equal Pay Act is "willful" in at least two other instances: where the employer "is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt," and where "an equally aware employer consciously and voluntarily charts a course which turns out to be wrong." Id. at 462.
 
 
 53
 NWA was held to have failed the second branch of this test:
 
 
 54
 NWA not only knew of the Equal Pay Act and its content but also correctly understood its prohibition on different salary levels for men and women performing substantially similar work. With little or nothing beyond internal consideration by laymen--even after the present legal challenge got under way--the company consciously though erroneously concluded that its treatment of pursers and stewardesses was unaffected by the Act. We deem that sufficient to comprise willfulness; in the District Court's words, "[t]he conduct of the Company in the exercise of that judgment was willful."
 
 Id. at 463 (citation omitted).[22]
 
 55
 In this appeal, NWA argues that the law of the case established in Laffey I is "clearly erroneous" and the source of "manifest injustice," once again urging upon us a contrary analysis of the legislative intent undergirding section 255(a). NWA contends that a proper reading of the legislative history of the 1966 FLSA amendments "confirms that Congress meant [the willfulness standard] to encompass only intentional disregard for the law, rather than the deliberate-but-erroneous test adopted" in Laffey I. NWA Brief at 23. For the reasons stated below, we disagree with NWA as to the proper test of willfulness under the Equal Pay Act. Accordingly, we reaffirm Laffey I 's finding that NWA willfully violated the Act within the meaning of section 255(a).
 
 
 56
 In recasting its version of the relevant legislative intent, NWA argues that the Laffey I court was erroneously of the view that there was no relevant legislative history to shed light on the pivotal word, "willful." NWA Brief at 85. NWA accordingly invites us to focus on three unadopted 1965 bills which were the predecessors of the 1966 amendments. NWA deems "crucial" certain portions of the hearings on one of those bills, H.R. 8259, 89th Cong., 1st Sess. (1965), and the report of the House Education and Labor Committee on a second bill, H.R. 10518. H.R.Rep. No. 871, 89th Cong., 1st Sess. (1965). The importance of the latter is touted on the basis that it represents the "first appear[ance] [of section 255(a) ] in its present form." NWA Reply Brief at 42.[23]
 
 
 57
 The original administration-sponsored bill, H.R. 8259, sought, inter alia, to increase the limitations period to three years for all FLSA claims, and accordingly did not prescribe willfulness as a precondition to liability for the third year. NWA attempts to fashion a favorable interpretation of the willfulness provision ultimately incorporated into section 255(a) in the following manner: first, NWA summarizes a few snippets of testimony against H.R. 8259,[24] and then notes that at the conclusion of the hearings, "the Subcommittee met in executive session and drafted a new bill that included the [willfulness] language ultimately enacted." NWA Brief at 85. NWA then attributes this change to legislators who opposed the extension of liability in cases not involving conscious disregard of the law. Id. at 86. To substantiate this new learning as to the true meaning of the legislative materials, NWA cites a sentence from the minority statement in the Committee report on the revised bill, indicating that the Subcommittee's discussions had "resulted in the adoption of several amendments offered by members of the minority." Id. (citing H.R.Rep. No. 871, supra, at 74). NWA jumps from this statement to the conclusion that the willfulness provision was adopted "in response to the criticism of the proposal to impose an additional year of liability even on 'honest' violators of the [Equal Pay] Act." NWA Reply Brief at 42.
 
 
 58
 NWA's argument proves no such thing. The single sentence upon which it relies from the minority statement provides woefully inadequate support for its restrictive reading of the "willfulness" language. That sentence stands all by itself in the introduction to the minority report. Nowhere in this document is there any description of the amendments which the minority proposed, why it proposed them, what the majority said in response to the proposals, or why the proposals were adopted by the full Committee. Moreover, the minority report does not contain a single word about the "willfulness" provision in H.R. 10815. This brings us, then, to a broader point about this provision. The proposed legislation was lengthy, complex, and dealt with a number of thorny issues, including an increase in the minimum wage and a significant expansion of the FLSA's coverage. Adoption of the "willfulness" language ultimately codified in section 255(a) was undoubtedly a matter of limited congressional focus in the 1965 and 1966 deliberations over this legislation; the paucity of pertinent legislative materials, therefore, is not surprising.
 
 
 59
 Given the relative silence of the legislative record in this respect, Laffey I, 567 F.2d at 460, a silence which NWA has not persuasively broken with its theory advanced on this third appeal, we defer to the careful treatment and final settlement of this issue in Laffey I. The law of the case we honor here rests on the Laffey I court's painstaking review of the legislative history, including Congress' pivotal concern over small, unsophisticated businesses--a category that manifestly excludes NWA--which might not recognize the sweep of the FLSA's coverage. Id. at 460-61. Equally important, Laffey I recognized the need for a liberal construction of remedial statutes, and at the same time appropriately took into account the absence of clear congressional intent to impose upon plaintiffs the heavy burden of demonstrating an employer's evil intent. Id. This latter point is especially important in light of the fact that the Equal Pay Act merely allows a plaintiff to recover, after an appropriate showing, wages which have been improperly denied, and does not involve the imposition of criminal sanctions.
 
 
 60
 In short, we find nothing compelling, and certainly nothing demonstrating "clear error" in this court's earlier opinion, in the 1965 sources relied upon by NWA. The careful analysis of the meaning of 29 U.S.C. Sec. 255(a) set out in Laffey I must stand.
 
 B. Backpay
 
 61
 Moving from the domain of the Equal Pay Act's legislative history to an issue under Title VII, the district court's 1974 Remedial Order awarded each Title VII plaintiff[25] backpay in the amount of the full difference between what she earned as a stewardess and what she would have earned if she had been paid at the same rate as a purser of equal seniority. 374 F.Supp. at 1385-86. On appeal in Laffey I, NWA challenged certain aspects of these "remedial measures," 567 F.2d at 437, including what it saw as the district court's improper refusal to adjust the pursers' rates of pay downward in the amount of the compensation allegedly based on the "foreign flying" required of pursers. Of pivotal importance, however, NWA failed at that time to appeal the underlying decision to use pursers' pay rates as the upper end of the back-pay formula.
 
 
 62
 The court in Laffey I determined that NWA had failed to show that any portion of the pursers' pay was attributable to "foreign flying." 567 F.2d at 452 n. 153. See infra section III. B.2. The Laffey I decision also affirmed the back-pay formula adopted by the district court. Id. at 478.
 
 
 63
 In 1978, following the remand of these proceedings to the district court after Laffey I, NWA for the first time attacked the use of the full purser rates, apart from its unsuccessful, earlier argument with respect to the alleged "foreign flying" component. NWA at this juncture claimed that the district court should use a hypothetical wage rate which would have been paid to a single, combined class of "cabin attendants," rather than purser rates, in computing backpay. Record Document ("R.") 16. The district court, however, refused to entertain NWA's argument, on the ground that "the relief requested is precluded by the Judgment of the Court of Appeals in that it is beyond the Mandate of that Court and seeks to raise issues not challenged on appeal ...." Order Denying Motion to Modify Award of Backpay to the Title VII Class (D.D.C. July 9, 1979), R. 50.
 
 
 64
 NWA now seeks to avoid the law of the case as to the computation of backpay by arguing that under the post-Laffey I decisions of the Supreme Court in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), City of Los Angeles v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), and Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the back-pay award here impermissibly overcompensates the Title VII plaintiffs by placing them "in a better position than they would have been in if the alleged discrimination had not occurred." NWA Brief at 15; see also id. 43-47. NWA also revives its earlier, unsuccessful argument that the back-pay awards under both Title VII and the Equal Pay Act are incorrectly inflated by the court's failure to exclude from pursers' pay that portion attributable to "foreign flying." NWA once again tries to characterize "foreign flying" compensation as a "factor other than sex" for Equal Pay Act purposes, and invokes the three above-cited High Court decisions in support of its claim that Title VII damages should be reduced by this amount.
 
 
 65
 Because this court affirmed the back-pay awards in Laffey I, and inasmuch as we discern no relevant supervening change in the law embodied in the decisions relied upon by NWA, we decline the invitation to overturn the law of the case as to the computation of backpay.
 
 
 66
 1. Wage Rate for Hypothetical Combined Cabin Attendant Classification
 
 
 67
 NWA strenuously contends that if it had not maintained the sex-segregated job classifications of purser and stewardess and had, instead, used only a single "cabin attendant" classification, the wage rate paid to employees in that hypothetical classification would have closely approximated the rates paid by other airlines with only a single classification, rather than the "premium pay level" NWA established for pursers. In support of this proposition, NWA relies upon an affidavit proffered in 1978. See Declaration of Terry M. Erskine, Joint Record Excerpts ("J.R.E.") 139.
 
 
 68
 NWA argues that the use of the pursers' pay rate in the back-pay formula, rather than the lower rate which arguably would have been paid to those in the hypothetical, combined cabin attendant classification, violates the bedrock rule that Title VII backpay may not "catapult [plaintiffs] into a better position than they would have enjoyed in the absence of discrimination." Ford Motor, supra, 458 U.S. at 234, 102 S.Ct. at 3067. It also argues that Manhart, in particular, establishes that the back-pay remedy here was improper. NWA Brief at 43-44.
 
 
 69
 We disagree. In the first place, and most critically, we do not read these three High Court decisions as establishing any pertinent new rule of law as respects this case under Title VII. The fundamental proposition that the purpose of Title VII remedies is to "make whole" the victims of discrimination has been settled for some time, see, e.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975), and was clearly recognized by this court in Laffey I. See 567 F.2d at 476 ("The remedial order in this case is to make employees whole, but not more than whole."). Therefore, we perceive nothing new, as respects NWA's argument, in these three decisions.
 
 
 70
 We also find unpersuasive NWA's assertion that Manhart compels the abandonment of the back-pay formula affirmed in Laffey I. Above all, Manhart arose out of the extraordinarily sensitive setting of a sex-based contributory system in a pension plan, circumstances far removed from the situation here of treating female employees differently although they performed the same work as male employees. Second, the only language that provides comfort to NWA is set forth in a single footnote,[26] consisting of guardedly worded dicta. Manhart, in contrast to the case before us, disallowed any retroactive monetary award, and in the course of so doing suggested that if such an award had been appropriate, the lower court "should at least have considered" a different formula. The High Court's understandably deep concern for equitable considerations, including the grave consequences to pension funds flowing from a retroactive finding of liability, strongly suggests that this portion of the Manhart footnote was not addressed to the matter of remedies in garden-variety Title VII cases, such as the case at hand.[27]
 
 
 71
 Moreover, in the absence of supervening, controlling authority, NWA cannot properly request--for the first time--that this court mandate the use of "averaging techniques" in the back-pay formula.[28] As explained supra at p. 1076, the procedural posture of this case at the time of Laffey I "enabled review on the merits of all interrelated features of the order save those the District Court had reserved for future adjudication," Laffey II, 642 F.2d at 584 n. 49. The issues reserved by the district court dealt only with the "mechanics of payment" pursuant to the 1974 Remedial Order. See 374 F.Supp. at 1389. The part of the case that the court reserved obviously did not include the back-pay formula itself, which was clearly set out by the district court, id. at 1385-87 (paragraphs 5-7), and which plainly used the full purser pay rates as the upper end of the back-pay computation.[29] Thus, NWA had the opportunity to appeal any feature of the back-pay award, including the use of the full purser rates, in Laffey I. Therefore, NWA must be deemed to have waived any argument available at that time which it did not assert.
 
 
 72
 Adherence to the rule that a party waives a "contention that could have been but was not raised on [a] prior appeal," Munoz v. County of Imperial, 667 F.2d 811, 817 (9th Cir.), cert. denied, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982), is, of course, necessary to the orderly conduct of litigation. Failure to follow this rule would lead to the bizarre result, as stated admirably by Judge Friendly, "that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir.1981), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). NWA's failure to challenge the backpay formula on its first appeal resulted in the Laffey I affirmance of that portion of the 1974 Remedial Order, and the inclusion of the formula in the law of the case. See Raxton Corp. v. Anania Associates, Inc., 668 F.2d 622, 624 (1st Cir.1982).
 
 2. Foreign Flying
 
 73
 As previously indicated, NWA reargues its already rejected position that purser pay included compensation directly traceable to "foreign flying" and that this component of compensation should be excluded as a "factor other than sex" under the Equal Pay Act back-pay computations, and from the Title VII back-pay computations under the Supreme Court decisions discussed supra in section III.B.1.
 
 
 74
 We disagree. We find, for the reasons outlined in the preceding section, that the Supreme Court decisions in Manhart, Teamsters, and Ford Motor do not bring into question the treatment in Laffey I of the "foreign flying" issue, as those cases merely articulate already established principles of Title VII law.[30] NWA's other arguments on this issue are foreclosed by the law of the case, clearly set out in Laffey I, 567 F.2d at 452-53 n. 153. Unless there is supervening authority, and we have concluded that there is none, NWA must satisfy the stringent test of "clear error" and "manifest injustice," a rigorous standard which has not been met as to the foreign flying issue. As this court held eight years ago, NWA simply failed to carry its burden on this issue the first time around. We refuse to replough this well-worn field that much deserves henceforth to lie fallow.
 
 C. Composition of the Title VII Class
 
 75
 NWA challenges the composition of the Title VII class on several grounds. It argues that the district court's order of December 5, 1980, J.A. 168, improperly added to the class "hundreds of new employees" who had been "hired after the cut-off date for the last round of notices" of the class action. NWA Brief at 55-56. NWA also appeals from the district court's order of June 6, 1980, J.R.E. 162, which included in the Title VII class two groups of stewardesses which NWA seeks to exclude--those on leave from their jobs as stewardesses as of the cut-off date who subsequently decided not to return to work, and those who as of the cut-off date had transferred permanently to non-stewardess jobs at NWA. We consider each of these arguments separately.
 
 
 76
 1. Stewardesses Not Notified of Class Action
 
 
 77
 In its February 1971 order, the district court certified the instant case as a class action under both Fed.R.Civ.P. 23(b)(2) and 23(b)(3). The court defined the Title VII class as "all female in-flight cabin attendants currently employed by [NWA] and/or employed by [NWA] any time since July 2, 1965." 321 F.Supp. 1041, at 1043. Thereafter, two rounds of notices were sent to class members, in 1971 and 1972, pursuant to the requirements of Fed.R.Civ.P. 23(c)(2).
 
 
 78
 The district court, in its 1974 Remedial Order, again defined the term "Title VII plaintiff(s)" to include "all female cabin attendants employed by [NWA] at any time on or after July 2, 1965, excluding only those who filed timely written elections with this Court to be excluded from this lawsuit in its entirety." 374 F.Supp. at 1384. In its appeal from this order in Laffey I, NWA did not challenge the foregoing definition of the class on the grounds it now advances. NWA did, however, challenge the inclusion of stewardesses whose employment with NWA was terminated prior to the ninetieth day preceding the first filing with the Equal Employment Opportunity Commission ("EEOC"). The Laffey I court agreed, and directed the district court to exclude this group of ex-employees from the class. See infra section III.C.2. On remand, the district court corrected its earlier error (and another, minor mistake as to the actual date of the first EEOC filing). It redefined the Title VII class to include only stewardesses who were employed by NWA on or after January 29, 1970. Employees terminated prior to this date were to be included only on a showing of certain extenuating circumstances. This redefinition was reflected in the district court's Order Respecting Computation of Backpay and Implementation of Final Judgment, November 30, 1982.[31] Thus, NWA had scrutinized the Title VII class definition at the time of Laffey I.
 
 
 79
 Seeking to avoid waiver and law of the case obstacles to appellate review, NWA claims, in effect, that it was not on notice at the time of Laffey I that the district court would include in the class stewardesses never furnished the requisite notice or opportunity to opt out under Rule 23(b)(3). NWA interprets the district court's refusal to exclude those stewardesses who had not received notice of the class action, J.A. 168, as dependent upon the district court's view that the parties and the court had shared, as of the time of the 1971 and 1974 orders, "the intent and understanding" that the definition of the Title VII class adopted therein was broad enough to encompass the disputed group of stewardesses. NWA Brief at 56-57.
 
 
 80
 NWA argues that there was no such "understanding" between the parties, and claims that it "proceeded to trial with the understanding that the backpay class had been fixed by the universe of cabin attendants to whom notice was sent." NWA Brief at 57. It further argues that the December 1980 order was improper, inasmuch as Rule 23(c)(1) permits a court to "alter" a class certification only prior to the decision on the merits. NWA perceives here the evil of "one-way intervention."
 
 
 81
 Appellees, on the other hand, heatedly dispute NWA's claim as to the original "understanding" that the Title VII class did not include the disputed group of stewardesses. Appellees cite to substantial portions of the record as support for the true "understanding" of an open-ended class.[32] Under appellees' theory, NWA had full knowledge of the manner in which the class definition would be applied and thus waived the arguments now advanced here because it did not assert those contentions in the proceedings leading up to the 1974 Remedial Order or in its appeal to this court in Laffey I. Appellees further argue that Laffey I established the open-ended class definition as the law of the case, which, as an additional ground, bars NWA from now attacking inclusion of the disputed group of stewardesses.
 
 
 82
 Without deciding whether the parties had the disputed "understanding" as to the meaning of the 1971 definition of the Title VII class, we conclude that NWA's attack on the 1980 order (and definition) is barred by the doctrines of waiver and law of the case. We reach this conclusion in light of the fact that the 1974 Remedial Order, issued long after the 1972 cut-off date now urged by NWA, contained essentially the same open-ended class definition as the 1971 certification order. NWA knew, or should have known, that the express terms of the 1974 order--sweeping into the class "all female cabin attendants employed by [NWA] at any time on or after July 2, 1965 " (emphasis added)could manifestly be read as extending beyond 1972. It was up to NWA to test the meaning of the 1974 order as to stewardesses who had not received notice of the class action, if it so desired, in its appeal from that order--the appeal which culminated in Laffey I. NWA failed to do so. NWA, albeit represented now by different counsel, must be held to have waived the opportunity to raise this issue. For the reasons stated supra at pp. 1089-1090, we must recognize the law of the case established in Laffey I.
 
 
 83
 In addition, we note that NWA's argument regarding the impropriety of "one-way intervention" has been rejected by other courts which have held that "classwide backpay under Title VII can be awarded in a [Rule 23] (b)(2) class action."[33] This development in Title VII law, signalled by the Fourth Circuit's 1971 decision in Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), was well under way as of NWA's appeal in Laffey I. Had NWA wished to clarify the definition of the Title VII class in relation to this expansion of (b)(2) actions, it clearly had the opportunity to raise the issue in Laffey I.[34]
 
 2. Former Stewardesses
 
 84
 In Laffey I, NWA argued that the district court erred, in its 1974 Remedial Order, "in granting relief pursuant to Title VII in the form of backpay to stewardesses whose employment with [NWA] [had] terminated more than ninety days prior to the first filing by an employee of [a] ... charge with the Equal Employment Opportunity Commission." 567 F.2d at 472. NWA's argument was based upon the settled rule that "only those employees who could have filed charges with the Commission individually when the class filing was made are properly members of the ... class." Id. NWA reasoned that the discrimination in this case "could not be deemed continuing as to those who left [NWA's] employ more than ninety days prior to the class filing with the [EEOC]," id. at 473, and that, as a result, those employees were not entitled to recover as members of the Title VII class.
 
 
 85
 The Laffey I court agreed with NWA's contention in this respect:
 
 
 86
 A severing of the employment relationship ordinarily terminates a discrimination against the severed employee, and activates the time period for filing charges with the Commission concerning any violation which occurred at separation or which may have been continuing up to the date thereof. To hold otherwise would effectively read the timely-filing requirement out of the statute.
 
 
 87
 Id. (citations omitted). Accordingly, the Laffey I opinion directed the district court, on remand, to "exclude from the Title VII recovery those employees whose connection with NWA was dissolved more than ninety days before the class filing with the [EEOC]," while retaining those terminated stewardesses "who would have brought themselves within the Equal Pay Act class ...." Id. at 476.
 
 
 88
 After remand, NWA then sought the exclusion of two additional groups of ex-stewardesses: those on leaves of absence on the 90th day prior to the filing of the first EEOC charge and who, subsequent to that date, left the employ of NWA without having returned to work as stewardesses; and those who were employed by NWA at least until the 90th day prior to the first EEOC filing, but who had transferred to non-stewardess positions. The district court denied NWA's requested exclusions in an order dated June 6, 1980. J.R.E. 162. This denial was based on the district court's understanding that Laffey I had resolved this issue. See District Court's Order of February 19, 1981, denying reconsideration of its June 6, 1980 order. J.A. 172, 173.
 
 
 89
 NWA challenges the June 6, 1980 order, arguing that the district court misunderstood Laffey I. Downplaying the fact that Laffey I dealt explicitly only with terminated stewardesses, NWA claims that a truer indication of that court's mandate was its recognition that "only those employees who could have filed charges with the Commission individually when the class filing was made are properly members of the litigating class." 567 F.2d at 472. This language, NWA argues, empowered the district court to consider its claims that certain stewardesses, other than those in the terminated group expressly dealt with in Laffey I, had no viable claims allowing their inclusion in the class. NWA traces the district court's failure to so interpret the mandate of Laffey I to its overly "wooden reliance" on the "phrase 'left the Company's employ ....' " NWA Brief at 61.
 
 
 90
 Without reaching the merits of NWA's arguments against inclusion of the two disputed groups of stewardesses, we hold that the district court correctly construed the Laffey I mandate. NWA had the opportunity in Laffey I to raise the issue of the status of these two additional groups of class members, just as it had the opportunity to raise the issue of the terminated stewardesses. NWA simply and indisputably failed to do so. Its failure to raise these arguments constituted a waiver of them. See supra at pp. 1089-1090. Moreover, as to the law of the case, in Laffey I the court "affirm[ed]," 567 F.2d at 478, the award of backpay to all class members except those "whose connection with [NWA] was dissolved more than 90 days before the class filing with the Commission." Id. at 476 (emphasis added). NWA's attack on the district court's December 1980 ruling is thus barred by the principles of waiver and law of the case.
 
 
 91
 IV. THE LIMITATION PERIOD ON TITLE VII BACKPAY
 
 
 92
 In the 1972 amendments to Title VII, Congress limited back-pay liability to no more than two years prior to the filing of charges with the Equal Employment Opportunity Commission. Laffey I held that the 1972 amendments did not apply to this case and directed the district court on remand to "determine the local statute of limitations most appropriate to this case," 567 F.2d at 469. On remand, the district court referred to District of Columbia law, noted that the District has no borrowing statute and generally applies its own statute of limitations as a "procedural" prescription, and determined that the most relevant statutes are the D.C. Minimum Wage Law, D.C.Code Ann. Sec. 36-416 (1973) (now codified at D.C.Code Ann. Sec. 36-216 (1981)), and the general statute of limitations, D.C.Code Ann. Sec. 12-301 (1981). See Laffey v. Northwest Airlines, Inc., 481 F.Supp. 199, 200-01 (D.D.C.1979). Both of these laws provide for a three-year limitations period.
 
 
 93
 Were we writing on a clean slate, we might well decide that the two-year rule specified in the 1972 Title VII amendments should apply, if not directly, then at least by analogy, as the best indicator of the federal legislators' view of the appropriate back-pay liability limitation period. We are reluctant, however, to depart from the law of the case on the nonretroactivity of Title VII's current two-year limitation. Nevertheless, we modify the district court's decision specifying a three-year period borrowed from the District of Columbia's minimum wage law or general statute of limitations. In the unique circumstances presented here, we hold that the time frame most appropriately borrowed is Minnesota's two-year limitation on "the recovery of wages ... under any federal or state law." Minn.Stat.Ann. Sec. 541.07(5) (West Supp.1982-1983).
 
 
 94
 Absent a federal limitation period which we can apply, we generally borrow the limitation period of the state in which the federal trial court sits. If a traditional statute of limitations were needed here, we would be required to employ a District of Columbia statute of limitations. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976); Forrestal Village, Inc. v. Graham, 551 F.2d 411, 413 (D.C.Cir.1977). However, what is at issue is not a statute of limitations in the usual sense but rather a substantive cap on the amount of backpay that may be awarded.
 
 
 95
 Having refused to apply the federal two-year limit, Laffey I stated:
 
 
 96
 [T]he problem at this point is simply that of fashioning a federal common law period of limitations. Most often this is effected by adopting the period prescribed by the most analogous state statute.... [A]doption of the state limitation period is proscribed only when it would create important conflicts with the federal policy underlying the cause of action or when it would amount to a discriminatory restriction of a federal right of action. Neither of those conditions exists here.
 
 
 97
 567 F.2d at 468-69 (footnotes omitted). The current two-year federal statutory cap on recovery, 42 U.S.C. Sec. 2000e-5(g), for which Laffey I wished to find a "federal common law" substitute, is not addressed, as a statute of limitations would be, to the timeliness of the filing of charges or the institution of a lawsuit. Timeliness of filing with the Commission is governed by section 2000e-5(e) and that of the institution of a lawsuit by section 2000e-5(f)(1). But when those provisions are satisfied by timely filings, and when a plaintiff has made his substantive case, section 2000e-5(g) comes into play for the first time to define the maximum remedy. As the court stated in Miller v. Miami Prefabricators, Inc., 438 F.Supp. 176, 181 (S.D.Fla.1977):
 
 
 98
 When measured against the broad "make whole" purposes of Title VII it becomes evident that the two year cap on back pay contained in 42 U.S.C. Sec. 2000e-5(g) is not a statute of limitations. Rather, that provision was inserted by Congress in an attempt to limit the back pay which could be recovered from employers who have been engaged in discrimination for many years.
 
 
 99
 As a limit on liability rather than a statute of limitations, section 2000e-5(g) is a substantive rather than a procedural measure. Where there is no similar back-pay cap in state law, a state statute of limitations will be used for federal purposes, here a substantive purpose. Where the issue is substantive, the District of Columbia does not automatically apply its own prescription. See In re Air Crash Disaster at Washington, D.C., 559 F.Supp. 333, 341-42 (D.D.C.1983); Williams v. Williams, 390 A.2d 4, 5 (D.C.1978).
 
 
 100
 In this case, we have been pointed to no jurisdictions other than Minnesota and the District of Columbia that have a relevant connection to the parties and actions involved in this litigation.[35] The District of Columbia is obviously a jurisdiction whose laws should be examined. But of the two conceivably applicable D.C. statutes, neither manifests a policy closely analogous to the one at stake here. The Minimum Wage Law, D.C.Code Ann. Sec. 36-203, on which the district court relied, is not designed to prevent sex discrimination but rather to establish minimum hourly wages, maximum hours, and overtime compensation rates. That statute's three-year limit on minimum wage claims, D.C.Code Ann. Sec. 36-216, seeks merely to prevent the prosecution of stale claims--a policy not implicated here. Likewise, the D.C. three-year "catch-all" statute of limitations, D.C.Code Ann. Sec. 12-301, on which the district court also relied, serves to limit the bringing of stale claims and evinces no particular interest in preventing sex discrimination.
 
 
 101
 Minnesota law is more to the point and there is no doubt that the parties and actions at issue touch and concern that state. Appellant is a Minnesota corporation; appellant's headquarters are in Minnesota; the wage scales challenged in this case were all set by collective bargaining agreements negotiated and signed in Minnesota; the employment relationship of every member of the appellee class was established in Minnesota and was controlled by decisions taken there; all interviews and hiring occurred in Minnesota; the employment contract of each appellee class member stated that it was to be "viewed as a Minnesota contract of employment governed by the laws of that state in every respect"; and, when this case was certified as a class action, notice was directed to 2,634 stewardesses, of whom only ten lived in the District of Columbia while 1,694 lived in Minnesota. See Declaration of James A. Abbott, R. 61 at paragraphs 2-4.
 
 
 102
 In contrast to the District of Columbia, Minnesota does have a statute closely analogous to Title VII, i.e., the Minnesota Human Rights Act, Minn.Stat.Ann. Sec. 363.01 (West 1983). Like Title VII, the Minnesota Human Rights Act extends its protection beyond sex-based classes to other groups and prohibits discrimination in aspects of employment besides compensation. The Minnesota Equal Pay Act that appellant would have us adopt merely prohibits wage differentials and protects only sex-based groups. Minn.Stat.Ann. Sec. 181.67 (West 1983). Significantly, the Minnesota Supreme Court, in discussing the Minnesota Human Rights Act, has applied case law interpreting Title VII. See Brotherhood of Railway & Steamship Clerks v. State, 303 Minn. 178, 188-91. 229 N.W.2d 3, 9-11 (1975).
 
 
 103
 The Minnesota Supreme Court has decided that Minn.Stat.Ann. Sec. 541.07(5) (West Supp.1982-1983) is the statute of limitations that should govern claims of discrimination brought under the Human Rights Act. See Brotherhood of Railway & Steamship Clerks, 303 Minn. at 195-96, 229 N.W.2d at 13-14. Section 541.07(5) prescribes a two-year limitations period "for the recovery of wages or overtime or damages, fees or penalties accruing under any federal or state law respecting the payment of wages or overtime or damages, fees or penalties...." We find that the limitations period for recovery of backpay should be established by recourse to that statute. Accordingly, the recovery period is two years.
 
 V. THE LIQUIDATED DAMAGES AWARD
 
 104
 The district court's 1974 Remedial Order, 374 F.Supp. at 1390, disallowed liquidated damages under the Equal Pay Act. On appeal in Laffey I, we "remand[ed] the matter of liquidated damages in toto for reconsideration by the District Court." 567 F.2d at 466 n. 279. With our Laffey I instructions as its guide, the district court permitted further discovery and ultimately found that the relevant facts mandated a liquidated damages award. Laffey v. Northwest Airlines, Inc., 24 Empl.Prac.Dec. (CCH) p 31,384 (D.D.C. Nov. 21, 1980) [hereafter, Nov. 21, 1980, Decision ]. NWA contends that the district court erred in finding liquidated damages mandatory and in calculating the amount of the award. We reject both contentions as insubstantial and sustain the district court's liquidated damages adjudication in all respects.
 
 
 105
 A. Plaintiff's Entitlement to Liquidated Damages
 
 
 106
 As Laffey I recounted, 567 F.2d at 463-65, the Fair Labor Standards Act, which serves as the procedural and remedial framework for Equal Pay Act claims, initially provided that prevailing employees were entitled to an automatic award of liquidated damages in an amount equal to unpaid wages. Congress amended the statute in 1947[36] to commit to judicial discretion disallowance or limitation of liquidated damages if the employer satisfies the court that he acted "in good faith" and with "reasonable grounds for believing that his act or omission was [lawful]." 29 U.S.C. Sec. 260 (1982). Both prior to and after this amendment, courts have described liquidated damages as serving a compensatory, not a penal, purpose. See, e.g., Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945); Thompson v. Sawyer, 678 F.2d 257, 281 (D.C.Cir.1982); Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir.1982); Usery v. Chef Italia, 540 F.Supp. 587, 591 n. 9 (E.D.Pa.1982).
 
 
 107
 Initially, the district court concluded that NWA had acted "in good faith": NWA committed a "willful" violation of the Equal Pay Act, the court explained, because it "was fully aware of [the Act] and adopted a deliberate and knowing course of conduct despite its awareness"; but the evidence did not indicate "an intentional, bad faith, attempt [by NWA] to evade the law." 1974 Remedial Order, 374 F.Supp. at 1390.[37] For several reasons, the district court, on first examination, also found it "not unreasonable" for NWA to believe that its purser/stewardess pay differential was lawful. Id.
 
 
 108
 On review, we held "the reasons given by the District Court for disallowing liquidated damages ... legal[ly] inadequa[te]." Laffey I, 567 F.2d at 465. "The good faith of which the Act speaks," we restated, "is 'an honest intention to ascertain what the ... Act requires and to act in accordance with it.' " Id. at 464 (quoting Addison v. Huron Stevedoring Corp., 204 F.2d 88, 93 (2d Cir.), cert. denied, 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953) ). "Good faith" must be established affirmatively, we observed; it is not enough that "it appear that the employer probably did not act in bad faith." Laffey I at 465.
 
 
 109
 Four of the five reasons supplied by the district court for finding NWA reasonably believed it complied with the law related to then traditional industry practice and employee acquiescence.[38] We stated: "That an employer and others in the industry have broken the law for a long time without complaints from employees is plainly not the reasonable ground to which the statute speaks." Id. (footnote omitted). Further, we remarked that "the prevalence of sex-discrimination litigation against the airline industry naturally prompts the question whether NWA should reasonably have known that neither its own tradition, the industry custom nor the employees' silence was a reliable indicium of the demands of the law." Id. (footnotes omitted).[39]
 
 
 110
 In Laffey I, we recognized that "[a]ny assessment of an employer's good faith or grounds for his belief in the legal propriety of his conduct is necessarily a finding of fact, to be disturbed on appeal only if clearly erroneous." 567 F.2d at 464 (footnote omitted). We found, however, that the district court had erroneously declared and applied the governing law: it had misperceived the meaning of both "good faith" (by apparently accepting the absence of bad faith as sufficient) and "reasonable grounds" (by considering several factors irrelevant to that determination). The "clearly erroneous" rule, see FED.R.CIV.P. 52(a), therefore did not stand in the way of a remand.
 
 
 111
 On this appeal, by contrast, we find no legal infirmity in the district court's assessment. Instead, we are satisfied that the district court closely followed the guidance supplied in Laffey I, which constitutes the law of the case and of this circuit. Approaching the district court's fact findings with appropriate regard to that tribunal's function and to the need for finality served by FED.R.CIV.P. 52(a), we have no occasion to disturb the liquidated damages award.
 
 
 112
 We summarize here the principal points made by the district court, with ample record support, in explanation of its ultimate finding that NWA did not have "a reasonable foundation for a positive belief that in fact its policies compl[ied] with the law." Nov. 21, 1980, Decision, 24 Empl.Prac.Dec. at 18,286 (emphasis in original). First, NWA officials concluded that the jobs of purser and stewardess were in fact different "without consulting the in-flight supervisors responsible for knowing the duties of each, without commissioning a study of the jobs (as they did nine years later), and without scrutinizing the jobs for differences in duties." Id.[40] Next, NWA's alleged belief that "wages established through collective bargaining" were invulnerable to Equal Pay Act challenge, despite the language of the Act and the Wage-Hour Administrator's published interpretation,[41] could not rest on "an honest intention to ascertain what the Act required." Id.
 
 
 113
 Additionally, NWA could not establish its "good faith" by reason of its termination of "other discriminatory personnel practices--after considerable delay and an EEOC finding of probable violations." Id. (emphasis in original). Further, NWA gained no mileage from its "purported reliance on an EEOC statement that the duties of the purser and stewardess were different," for the vaunted EEOC statement "merely recited [NWA's] own job descriptions." Id. at 18,287. Finally, NWA's actions "after the lawsuit was filed ... fail[ed] to satisfy its burden of showing an honest intention to comply [with the law] prior to commencement of litigation." Id. (emphasis in original).[42]
 
 
 114
 In Laffey I, we cautioned the district court that the employer bore a " 'substantial burden' of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance." 567 F.2d 464-65 (quoting in part Rothman v. Publicker Indus., Inc., 201 F.2d 618, 620 (3d Cir.1953)) (footnote omitted). "If the employer cannot convince the court in these respects," we emphasized, "an award of liquidated damages remains mandatory." Id. at 465 (footnote omitted). The district court, for solid, plainly stated reasons, was unconvinced that NWA acted with the requisite "good faith" and "reasonable grounds."[43] We uphold that determination as free from any clear error.
 
 B. The Liquidated Damages Calculation
 
 115
 NWA next argues that, even if the district court properly determined that the statute entitled the Equal Pay Act plaintiffs to liquidated damages, the years 1974 and 1975 should have been left out of the calculation. These are the relevant facts. NWA's contract with the cabin attendants' union expired at the end of 1973. Negotiations for a new contract took place in 1974 and 1975. During that two-year interval, pursers and stewardesses were paid under the terms of the expired contract, which accorded higher pay to pursers. The new contract, signed December 20, 1975, equalized purser and stewardess wage rates[44] and provided for a retroactive adjustment covering the negotiation period.
 
 
 116
 Thus, in early 1976, the stewardesses received "retro-pay" for the difference between wages paid pursers and stewardesses in 1974 and 1975. The parties agreed on subtraction of this retro-pay from NWA's basic back-pay liability. NWA unsuccessfully sought credit for the retro-pay against liquidated damages as well, and now challenges the district court's refusal to subtract the retro-pay from the liquidated damages award. See Laffey v. Northwest Airlines, Inc., 582 F.Supp. 280 at 281, 282-284 (D.D.C.1982) [hereafter, Oct. 25, 1982, Mem. Op.], reprinted in J.R.E. 180, 183-89.
 
 
 117
 In opposing credit for the retro-pay against liquidated damages, plaintiffs relied on the district court's November 1973 Findings, 366 F.Supp. at 789, holding that the purser/stewardess pay differential violated the Equal Pay Act.[45] Retroactive adjustment over two years later, plaintiffs argued and the district court agreed, did not relieve NWA of its liquidated damages liability for the years 1974 and 1975, a period during which pursers received, but stewardesses continued to await, the higher pay. NWA, on the other hand, maintained that the retro-pay stewardesses received in 1976 should be treated for all Equal Pay Act remedial purposes as if it had been paid in 1974 and 1975. NWA characterized payments under 1973 contract as merely "on account"; lump-sum adjustments retroactively establishing actual wage rates for past years, NWA stressed, were a "standard feature of labor agreements in the airline industry." See Oct. 25, 1982, Mem.Op. at 282, reprinted in J.R.E. 185 (quoting NWA); NWA Brief at 22, 82.
 
 
 118
 We conclude that the district court appropriately refused to "relate back" the retro-pay, and thereby exclude 1974 and 1975 from the liquidated damages calculation. The wages involved in fact were not received until two years after they were earned. That reality, in the circumstances here presented, is dispositive of plaintiffs' statutory entitlement to liquidated damages.
 
 
 119
 In rejecting NWA's "relate back" argument, the district court stressed this central consideration: "liquidated damages are not punitive"; they are intended to compensate employees for a payment delay "which might result in damages too obscure and difficult of proof" to be redressed by any other means. Oct. 25, 1982, Mem.Op. at 282-283, reprinted in J.R.E. 185-86 (quoting language appearing in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 583-84, 62 S.Ct. 1216, 1222-23, 86 L.Ed. 1682 (1942)); see cases cited supra ----. As its principal ground of objection to the district court's ruling,[46] NWA asserts that section six of the Railway Labor Act, 45 U.S.C. Sec. 156 (1982), obligated it to maintain the status quo as to all conditions of employment, including wages, during the two-year pendency of contract negotiations.[47] That Act, we are confident, does not stop an employer from immediately equalizing wages upward in accordance with the judicial determination that an existing wage disparity violates the Equal Pay Act.[48]
 
 
 120
 The Railway Labor Act provision NWA cites fosters bargaining over disputes to avert the disruption of commerce strikes and lockouts occasion. See, e.g., Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 148-50, 90 S.Ct. 294, 298-299, 24 L.Ed.2d 325 (1969). But the Equal Pay Act requires equalizing the wages of the lower paid sex up to the level of the higher paid sex. See, e.g., Corning Glass Works v. Brennan, 417 U.S. 188, 206-07, 94 S.Ct. 2223, 2233-2234, 41 L.Ed.2d 1 (1974). A court determination of an Equal Pay Act violation leaves nothing for the employer and union to bargain about. Just as the National Labor Relations Act's prohibition against an employer's unilateral change in wages under negotiation[49] gives way to commands for an employer's compliance with other laws,[50] so the analogous provision of the Railway Labor Act erects no obstacle, on the facts here presented, to an employer's immediate payment of equal wages to men and women performing equal work.
 
 
 121
 Stewardesses did not receive until 1976 pay made to pursers in 1974 and 1975; NWA must now compensate for the withholding period, during which it remained out of compliance with the Equal Pay Act, by paying the liquidated damages ordered by the district court.
 
 
 122
 VI. ISSUES RAISED BY LAFFEY AS CROSS-APPELLANT
 
 A. Pre-Act Longevity
 
 123
 In calculating the amount of backpay due for NWA's post-Act wage violations, the district court held that the women should receive credit only for stewardess service performed subsequent to the Act under which they were recovering. The district court reasoned that the Supreme Court's decisions in United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), and International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), precluded crediting the women with pre-Act longevity. Because we find that the district court improperly applied these decisions, we reverse.
 
 
 124
 The back-pay recovery period covers the years 1967 through 1976. During that time NWA had a pay ladder for pursers such that salary rose with increased years of service or "longevity." Under this policy a man hired as a purser in 1957 would have accumulated ten years' longevity by 1967 and would have been paid accordingly. The issue facing the district court was whether, for purposes of computing backpay, a woman who had also been hired in 1957 as a cabin attendant and who had worked continuously as such until 1967 should be credited with the same longevity in determining her 1967 salary. Under the district court's holding, the woman in this example would be entitled only to the pay of a purser with three years' longevity if she were recovering under the Equal Pay Act. She would be entitled only to the pay received by a purser with two years' longevity if she were recovering under Title VII.
 
 
 125
 We think that a woman hired in 1957 should today be credited with the same longevity as a man hired in that year. This does not involve finding that discrimination prior to the passage of the Act was somehow illegal. The stewardesses claim no damages for pre-Act pay differentials, nor could they. Their claim is that their current status be the same as that of men who have the same job characteristics, including job longevity. That claim of equal treatment seems to us required by the law. Indeed, the only case authority we have found dealing expressly with this subject holds squarely that a back-pay award should take into account "the length of service of the employees," including years of service prior to the effective date of Title VII. Sears v. Atchison, T. & S.F. Ry., 645 F.2d 1365, 1378 (10th Cir.1981), cert. denied, 456 U.S. 964, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982).
 
 
 126
 United Air Lines, Inc. v. Evans and Teamsters v. United States are not to the contrary. In these cases the Supreme Court held that bona fide seniority systems do not violate Title VII even where they perpetuate the effects of prior discrimination. The Court based its decisions on section 703(h) of that Act, which provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin ...." Section 703(h), 42 U.S.C. Sec. 2000e-2(h) (1976). These decisions do not apply to cases, such as the present one, where there is no allegation that a seniority system violates Title VII, but only a claim for an appropriate remedy.[51] The distinction between a remedy issue and a violation issue under Title VII was explained in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and repeated in United Air Lines, Inc. v. Evans, 431 U.S. at 559, 97 S.Ct. at 1889-1890. In Evans the Court stated:
 
 
 127
 The difference between a remedy issue and a violation issue is highlighted by the analysis of Sec. 703(h) of Title VII in Franks. As we held in that case, by its terms that section does not bar the award of retroactive seniority after a violation has been proved. Rather, Sec. 703(h) "delineates which employment practices are illegal and thereby prohibited and which are not." 424 U.S. at 758 [96 S.Ct. at 1261].
 
 
 128
 431 U.S. at 559, 97 S.Ct. at 1889-1890 (footnote omitted) (emphasis added). Clearly, section 703(h) does not preclude the crediting of retroactive pre-Act longevity in the present case. Indeed, Franks v. Bowman Transportation highlights this point by stating:
 
 
 129
 There is no indication in the legislative materials that Sec. 703(h) was intended to modify or restrict relief otherwise appropriate once an illegal discriminatory practice occurring after the effective date of the Act is proved ....
 
 
 130
 424 U.S. at 761-62, 96 S.Ct. at 1262-1263.
 
 
 131
 Having demonstrated that the district court's holding was not required by Evans and Teamsters, we turn to the affirmative reasons for according pre-Act longevity. To deny women longevity credit for their pre-Act service, when men were given such credit for doing what the court has held to be the same work, would "differentiat[e] between similarly situated males and females on the basis of sex." Evans, 431 U.S. at 558, 97 S.Ct. at 1889. If NWA unilaterally computed the backpay in this way, its action would violate Title VII; a fortiori, such a method of calculation is not permissible as part of a judicial remedy. Moreover, such a limited remedy would run counter to the "make whole" purpose of Title VII. Albemarle Paper Co. v. Moody, 422 U.S. 405, 419, 421, 95 S.Ct. 2362, 2372, 2373, 45 L.Ed.2d 280 (1975). The Supreme Court has stated that Congress' purpose in vesting discretionary powers in the courts to provide relief under Title VII was to "make possible the 'fashion[ing] [of] the most complete relief possible.' " Albemarle Paper Co., 422 U.S. at 421, 95 S.Ct. at 2373 (quoting section-by-section analysis accompanying Conference Committee Report on the Equal Employment Opportunity Act of 1972). We therefore reverse the district court's ruling on this issue and instruct the court to credit plaintiffs' pre-Act longevity in calculating backpay for the relevant, post-Act time periods.
 
 B. Interest
 
 132
 1. Rate of pre-judgment interest for the 1974-82 period
 
 
 133
 In paragraph 19 of its 1974 order, the district court made the following ruling on pre-judgment interest:
 
 
 134
 19. INTEREST--With respect to all monies to be paid under the foregoing provisions of this Order, the Company shall pay six percent interest per annum from the date the violation occurred giving rise to said liability through the date upon which payment is made in accordance with this Order.
 
 
 135
 1974 Remedial Order, 374 F.Supp. at 1389. In 1974, the district court believed that the judgment it was entering was a final one (R. 7, at 4; R. 115, at 25, 26). The panel in Laffey II, however, ruled in 1980 that the 1974 order was not a "final judgment," 642 F.2d 578, 583-84 (1980). This ruling had the effect of extending the prejudgment period from May 20, 1974 through the entry of final judgment on November 30, 1982.
 
 
 136
 Following the decision in Laffey II, plaintiffs moved for a determination of the pre-judgment interest that should apply to this additional period. Plaintiffs noted that interest rates generally had risen greatly after 1974 and recommended that the rate for each year of the 1974-82 period be 90% of the average prime rate for that year, compounded quarterly. At the hearing on plaintiffs' motion, the district court concluded that its prior ruling should not be revised. We affirm.
 
 
 137
 We are unpersuaded by plaintiffs' argument that the district court did not make a decision as to the rate of interest that should be awarded from 1974 to 1982. In rejecting plaintiffs' contention, the district judge stated that he had "determined the interest to be awarded without regard to the length of the pre-judgment period." R. 120; Laffey v. Northwest Airlines, Inc., 29 Empl.Prac.Dec. (CCH) 25,330, 25,332 (D.D.C. Oct. 6, 1981). Moreover, the express terms of the 1974 order set no limit on the length of the pre-judgment period. We stress that although the 1974 judgment was ultimately declared non-final, we entertained in Laffey I all objections to dispositive rulings that the parties placed before us. See Laffey II, 642 F.2d at 584 n. 49. We have discussed above the salutary purposes served by the doctrine of the law of the case. According to that doctrine,
 
 
 138
 a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.
 
 
 139
 1B J. Moore, Moore's Federal Practice p 0.404 (1983). Reconsideration of a prior decision, unappealed at an earlier stage although the opportunity to do so was present, is justified only in a limited number of circumstances:
 
 
 140
 [The law of the case] must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.
 
 
 141
 White v. Murtha, 377 F.2d 428, 431-32 (5th Cir.1967). See also Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1189-90 (5th Cir.1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Jennings v. Patterson, 488 F.2d 436, 441 n. 4 (5th Cir.1974). None of the above criteria for reopening the district court's decision obtains here. We therefore affirm the district court's holding that plaintiffs are entitled to pre-judgment interest at six percent simple for the 1974-82 period.
 
 
 142
 2. Post-judgment interest on liquidated damages
 
 
 143
 In 1981 the district court held that the law of the case precluded it from awarding post-judgment interest on liquidated damages. In paragraph 19 of its 1974 order, the district court noted, it had not awarded post-judgment interest on pre-judgment interest. By analogy, it reasoned, that ruling "is fully applicable to liquidated damages since liquidated damages are a substitute for pre-judgment interest" (R. 119, at 2). We do not believe that law of the case settles this issue. Our evaluation of the merits leads us to conclude that plaintiffs are entitled to post-judgment interest on liquidated damages. Consequently, we reverse.
 
 
 144
 The district court did not award liquidated damages until 1980; it thus had no occasion to decide in 1974--and it did not decide in 1974--whether plaintiffs were entitled to post-judgment interest on liquidated damages. That question did not arise until 1981, following our Laffey I decision. Since the district court had not previously decided this question, it was "free to rule thereon as it thought proper." Salvoni v. Pilson, 181 F.2d 615, 619 (D.C.Cir.), cert. denied, 339 U.S. 981, 70 S.Ct. 1030, 94 L.Ed. 1385 (1950).
 
 
 145
 The district court's 1974 ruling refusing to award post-judgment interest on pre-judgment interest does not apply by analogy here, for liquidated damages are not merely "a substitute for pre-judgment interest" (R. 119, at 2). As defined by this court in Thompson v. Sawyer, 678 F.2d 257, 281 (1982), liquidated damages are "compensatory, intended to reimburse workers for intangible losses--difficult to prove but nonetheless the very real consequences of unfair wages." Liquidated damages differ in amount and, to some extent, in kind from pre-judgment interest. Inasmuch as the law of the case did not control the question whether post-judgment interest should accrue on liquidated damages, that issue was and is open for determination on the merits.
 
 
 146
 The federal post-judgment interest statute, 28 U.S.C. Sec. 1961 (1982), provides, in relevant part:
 
 
 147
 Interest shall be allowed on any money judgment in a civil case recovered in district court ....
 
 
 148
 This statute has been interpreted to mean that
 
 
 149
 once a judgment is obtained, interest thereon is mandatory without regard to the elements of which that judgment is composed.
 
 
 150
 Perkins v. Standard Oil Co., 487 F.2d 672, 675 (9th Cir.1973); see R.W.T. v. Dalton, 712 F.2d 1225 (8th Cir.1983). The law requires the awarding of post-judgment interest on all elements of the judgment, including liquidated damages. We therefore reverse the determination below and hold that plaintiffs are entitled to post-judgment interest on liquidated damages.
 
 CONCLUSION
 
 151
 For the reasons stated, we instruct the district court on remand to (1) allow backpay under Title VII beginning two years, not three years, prior to the filing of the first EEOC charge; (2) credit plaintiffs with pre-Act longevity in calculating backpay due for post-Act service; and (3) allow post-judgment interest on liquidated damages. In all other respects, we affirm the district court's dispositions.
 
 
 152
 It is so ordered.
 
 
 
 [1]
 The practices cited in text were the predicate for monetary relief. Several other challenged practices were redressed solely by injunctive relief: restricting "purser" jobs to men alone; permitting male cabin attendants, but not females, to wear eyeglasses; permitting male attendants, but not females, to carry luggage of their own choice aboard flights; imposing flight arrangements under which male attendants, without regard to length of service, ranked as superior to female attendants aboard a plane; maintaining a shorter maximum height requirement for female cabin attendants than for males
 
 
 [2]
 A decision of one panel of this court may not be overruled by another panel; a panel's decision may be rejected only by the court en banc. See Brewster v. Commissioner of Internal Revenue, 607 F.2d 1369, 1373 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); United States v. Caldwell, 543 F.2d 1333, 1369 n. 19 (D.C.Cir.1974) (citing cases), cert. denied, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976)
 
 
 [3]
 The Act specifies four affirmative defenses; they permit payment of different wages for equal work if "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. Sec. 206(d)(1) (1982)
 
 
 [4]
 Specifically, in presenting its Gunther supervening law position, NWA acknowledges "the district judge's determination of the objective equality of the [purser and stewardess] jobs and the amount and nature of the pay differential." See Reply Brief of Northwest Airlines, Inc. [hereafter, NWA Reply Brief] at 17
 
 
 [5]
 We note, moreover, that Laffey I remanded the question of NWA's "good faith" for reconsideration by the district court, and supplied this instruction:
 Nor is it enough that it appear that the employer probably did not act in bad faith; he must affirmatively establish that he acted both in good faith and on reasonable grounds [the former involving a "subjective inquiry," the latter, "an objective standard"]. That duty is accentuated here, where the prevalence of sex-discrimination litigation against the airline industry naturally prompts the question whether NWA should reasonably have known that neither its own tradition [reserving pursers' jobs and pay for men], the industry custom nor the employees' silence was a reliable indicium of the demands of the law.
 Laffey I, 567 F.2d at 465 (footnotes omitted; quotations in brackets from id. at 464).
 
 
 [6]
 The Bennett Amendment provides that compensation differentiation "authorized by" the Equal Pay Act "shall not be an unlawful employment practice under [Title VII]." 42 U.S.C. Sec. 2000e-2(h) (1982)
 
 
 [7]
 See supra note 3
 
 
 [8]
 See, e.g., Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1136-37 (5th Cir.1983) (indicating that experience, if in fact the basis for a pay differential, qualifies as a "factor other than sex," but holding that even when the employer introduces evidence demonstrating a male employee's greater experience, plaintiff must be accorded a full and fair opportunity to rebut proof that the pay differential was in fact attributable to a demonstrated objective, non-sex-based factor). Plemer reversed a district court judgment for defendant, and emphasized that "once [an Equal Pay Act] plaintiff shows that she was paid less than a male who was performing substantially the same job," "the burden both of production and of [ultimate] persuasion" shifts to the employer. Id. at 1136. Cited to us by NWA as a supplemental authority, see FED.R.APP. P. 28(j); D.C. CIR.R. 8(k), Plemer offers not a shred of support for NWA's thesis that no liability for an Equal Pay Act violation is incurred by an employer who sincerely believed jobs a court finds equal were in fact different
 
 
 [9]
 NWA constantly tenders cropped snippets that convey less than comprehensively the Court's statements in Gunther. As a further example, NWA quotes the Court as "observ[ing] that a prohibition against discrimination against women 'because of their sex' strikes [only] at 'disparate treatment of men and women.' " NWA Brief at 29 (NWA's emphasis). The Court's opinion places the emphasis elsewhere: "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Gunther, 452 U.S. at 180, 101 S.Ct. at 2253 (quoting and adding emphasis to the Court's footnote in Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978), in turn quoting Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971)). It is remarkable that NWA has selected and adjusted to suit its purpose words that originated with the Seventh Circuit in Sprogis, a decision holding an airline's no-marriage rule for stewardesses unlawful under Title VII
 
 
 [10]
 The Court indicated in Gunther that the Equal Pay Act's fourth affirmative defense might shelter a pay standard otherwise vulnerable under Title VII as "fair in form, but discriminatory in operation." 452 U.S. at 170, 101 S.Ct. at 2248 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). NWA seizes on this acknowledgment that Equal Pay Act law may limit some Title VII neutral rule "disparate impact" claims, and insists that the Court somehow meant to infuse into Equal Pay Act law Title VII "disparate treatment" analysis developed in cases of alleged nonovert sex classification not even cited en passant in Gunther
 
 
 [11]
 From 1947, when the purser classification was established, until June 15, 1967, NWA confined the purser position to males. Between 1949 and 1957, NWA hired men for a second cabin attendant position. Men engaged for these posts were called "flight service attendants" (FSAs). FSAs performed essentially the same duties and received the same pay as female cabin attendants. Unlike the all-female stewardess class, however, FSAs had a contractual right to fill purser vacancies and were deemed qualified for purser posts upon completion of the FSA probationary period. By May 1965, all but three of the FSAs who remained with NWA had been elevated to purser positions. The three men who had not advanced to the purser category were voluntarily based in Hawaii. See 1973 Findings, 366 F.Supp. at 766-67, 772-73 (Findings of Fact (FOF) 11-17, 37-38)
 
 
 [12]
 An employer's "discriminatory motive" or "desire to pay men--because they were men--more than [women received]," far from ranking as an "essential element" of a plaintiff's claim, as NWA maintains, see NWA Brief at 14, 34, is not even relevant, under the Supreme Court's decisions, to the determination whether explicitly sex-based classification violates Title VII. See Arizona Governing Comm. for Tax Deferred Annuity & Deferred Compensation Plans v. Norris, --- U.S. ----, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983); Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). See also infra note 15
 
 
 [13]
 The court reviewed its prior holding, not for NWA's benefit, but "in the interest of soundness of the law for the future." Laffey II, 642 F.2d at 586. It acknowledged that outlays for uniforms and their maintenance, when made primarily for the employer's benefit, do not count as wages under the Fair Labor Standards Act. Id. at 588. Allowances that primarily serve the interest of the employee, however, do qualify as wages, the court stated. The male-only cleaning allowance, the court concluded, was a wage supplement, a benefit to the employee rather than a "boon to the employer." Id. at 589. Had the allowance primarily benefited the employer rather than the employee, the court observed, "NWA obviously would have extended it to female cabin attendants as well." Id
 
 
 [14]
 Moreover, the precedential force of Gilbert had become clouded before presentation of the Laffey II appeal. See Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 723-25, 98 S.Ct. 1370, 1382-1384, 55 L.Ed.2d 657 (1978) (Blackmun, J., concurring)
 
 
 [15]
 NWA, in its Gilbert argument, manifests a blindspot similar to the one evident in its failure to perceive, in presenting its Gunther argument, that when an employer intentionally classifies jobs or job benefits by sex, one need not search further to find differential treatment based upon gender. Compare, e.g., Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) with Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)
 
 
 [16]
 NWA, in its Reply Brief at 27-28, suggests that we view uniform-related benefits as a "grooming" issue with no discriminatory implications because of the "conventional distinction" in apparel men and women wear. While it is too late for NWA to dress the matter in new garb, we note that the question here is not whether men can be required to wear pants, and avoid kilts. Cf. Willingham v. Macon Tel. Publishing Co., 507 F.2d 1084 (5th Cir.1975) (en banc) (holding that Title VII is not violated by an employer's refusal to hire men (but not women) with long hair). Women's clothes require cleaning just as men's do; and prescribing more costly uniforms for stewardesses was NWA's decision, not a benefit women sought or an action impelled by the market or convention
 
 
 [17]
 See Pub.L. No. 95-555, 92 Stat. 2076 (1978) (codified at 42 U.S.C. Sec. 2000e(k) (1982))
 
 
 [18]
 The Supreme Court recently noted approvingly the dual elements of "clear error" and "manifest injustice" in law of the case doctrine, citing the White v. Murtha decision on which this court relied in its Melong analysis. Arizona v. California, 460 U.S. 605, ---- n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983)
 
 
 [19]
 Laffey II, 642 F.2d at 585-86, set out the following situations, drawn from Greater Boston Television Corp. v. FCC, 463 F.2d 268, 278-79 (D.C.Cir.1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972), in which a court may recall its mandate, to illustrate circumstances justifying a deviation from the law of the case:
 [T]o correct clerical mistakes, to clarify [the] opinion or mandate, to remedy fraud on the court or other misconduct, to avoid divergent results in cases pending simultaneously, or to minister to other similar aberrations.
 No such aberrations are present in the instant case.
 
 
 [20]
 NWA cites Usery v. Richman, 558 F.2d 1318, 1321 (8th Cir.1977); Noles v. Concord Lace Corp., 25 FEP Cas. (BNA) 367, 370 (M.D.N.C.1980), and 29 C.F.R. Secs. 800.122, 800.130 (1983), as authority for its assertion that "[j]obs that entail different degrees of supervisory responsibility are not equal within the meaning of the Equal Pay Act." NWA Brief at 41. None of these authorities conflict with the view of the court in Laffey I that supervisory responsibilities can be so minor as not to render two jobs unequal
 Indeed, NWA grossly misreads Usery's holding. In Usery, the court explicitly followed the Eighth Circuit's use of the "substantially equal" standard of comparison in evaluating the work of a male cook and four female cooks. 558 F.2d at 1320. That case in no wise stands for the proposition that any difference in supervisory responsibilities, without more, automatically works a cognizable legal difference in jobs. To the contrary, NWA conveniently and inexplicably overlooks the clear statements in Usery that the male employee had different responsibilities than female employees, worked during the cafe's busiest hours, was given greater duties of heavy lifting, was responsible for training other employees, and "had authority to make effective recommendations with regard to discipline." All this was sufficient for the Eighth Circuit to conclude, in affirming the district court's factual findings, that the job of the male employee had "[e]nough substantial distinctions [as to both] effort and responsibility ..." to render it legally different from the jobs of the four female employees. That case is a far cry from the instant situation.
 Similarly, in Noles the district court employed a "substantially equal" analysis in finding that the work of one male employee, who was "in charge of" an entire shift in one department of a textile mill, was not equal to that of the plaintiffs. Since the Noles opinion does not describe the nature of the male worker's supervisory responsibilities, NWA cannot plausibly maintain that the case stands for the proposition that any difference in supervisory duties renders jobs unequal. Moreover, another male worker had heavy lifting functions and was one of only a few employees trained in the operations of a particular kind of plant machinery.
 Finally, NWA can find no support in the cited Wage and Hour Division of the Department of Labor regulations. On the contrary, 29 C.F.R. Sec. 800.122 clearly states that "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." Far from offering support to NWA at this late stage of the litigation, this section, as noted in the text above, was invoked by the Laffey I court in its discussion of equal work. Nor does Sec. 800.130 provide any comfort to NWA. That section states, inter alia, the common-sense proposition that if an employee assumes supervisory responsibilities during the absence of the regular supervisor, higher wage rates to such a "relief" supervisor may be appropriate. But to embrace this proposition scarely means that we should read out of the regulations the bedrock principle that "insubstantial or minor differences" in skill or responsibility do not constitute a legally significant distinction between jobs. The issue is not, as NWA would have it, whether there are "different degrees of supervisory responsibility" but whether the differences are insubstantial and minor. As to that issue, NWA's arguments fail completely.
 
 
 [21]
 NWA claims that FOF 69 reflects an "erroneous assumption" by the district court that "the issue under the Equal Pay Act is whether the jobs are more alike than they are different...." NWA Brief at 42. This argument falls before the express language and plain meaning of FOF 69--that the supervisory functions "require no greater ... effort or responsibility." NWA is conveniently seeing ghosts in conjuring up the image of a district court--eleven years and two appeals ago--having fallen into error by embracing allegedly erroneous assumptions
 
 
 [22]
 Similar considerations regarding NWA's meager efforts to ascertain its obligations under the Equal Pay Act were central to the district court's award of liquidated damages, on remand from the decision in Laffey I, as discussed infra in section V
 
 
 [23]
 NWA claims that the Laffey I court "overlooked" this committee report. Id. While the opinion in Laffey I does not expressly refer to the report, it is clear that the court was aware of the genesis of section 255(a) as we know it. See 567 F.2d at 460 & n. 222 (reference to hearings on H.R. 8259). Even though neither party called the court's attention to the committee report in Laffey I, there is no reason to believe that the court was unaware of it. Moreover, NWA badly over-argues the point that the Laffey I court was operating without benefit of the enlightening legislative history which NWA has unearthed at the eleventh hour. NWA says that the Laffey I court fashioned its "willfulness" test "on the impression that there was no relevant legislative history." NWA Brief at 85. Laffey I said no such thing, nor did it imply as much. Rather, the court noted, quite correctly, that it had uncovered no "clearcut statement in the legislative history as to why the extension to three years was thus encumbered." 567 F.2d at 460 (emphasis added)
 
 
 [24]
 NWA specifically references a colloquy between Secretary of Labor Wirtz and Congressman Martin, an opponent of all three bills considered in 1965, in which Rep. Martin expressed concern that an across-the-board extension of the limitations period to three years would penalize employers who had not deliberately violated the law. Hearings on H.R. 8259 Before the House Ed. and Labor Comm., General Subcomm. on Labor, 89th Cong., 1st Sess. 54 (1965). NWA also notes that a number of witnesses in the hearings on H.R. 8259 were of the opinion that the back-pay period "should not be increased for violations which 'result from misunderstanding of the law,' or 'honest differences of opinions.' " NWA Brief at 85, citing id. at 980, 2250 (emphasis added)
 
 
 [25]
 It will be recalled that the instant action was brought both under Title VII and the Equal Pay Act. The back-pay element of relief was granted by the district court as part of the remedy to the Title VII class, as well as to the Equal Pay Act plaintiffs. In this appeal, NWA's challenge to the computation of backpay is with respect to the Title VII plaintiffs only
 
 
 [26]
 Footnote 36 of the Manhart opinion reads, in relevant part:
 Further doubt about the District Court's equitable sensitivity to the impact of a refund order is raised by the court's decision to award the full difference between the contributions made by male employees and those made by female employees. This may give the victims of the discrimination more than their due. If an undifferentiated actuarial table had been employed in 1972, the contributions of women employees would no doubt have been lower than they were, but they would not have been as low as the contributions actually made by men in that period. The District Court should at least have considered ordering a refund of only the difference between contributions made by women and the contributions they would have made under an actuarially sound and nondiscriminatory plan.
 435 U.S. at 720 n. 36, 98 S.Ct. at 1381 n. 36.
 
 
 [27]
 It is, as we note in the text above, clear that Manhart involved Title VII principles in the extraordinarily sensitive and complex setting of a contributory pension plan. Concern for the financial stability of pension plans, upon which employees ultimately rest their hopes and expectations for financial security at retirement, was evident throughout the Court's opinion. As Justice Stevens, speaking for the Court, put it: "Nor can we ignore the potential impact which changes in rules affecting insurance and pension plans may have on the economy. Fifty million Americans participate in retirement plans other than Social Security." 435 U.S. at 721, 98 S.Ct. at 1382. See also Arizona Governing Comm. for Tax Deferred Annuity & Deferred Compensation Plans v. Norris, --- U.S. ----, ----, 103 S.Ct. 3492, 3512, 77 L.Ed.2d 1236 (1983) (O'Connor, J.) (to avoid adverse impact on pension funds, decision extending Manhart 's liability rule should be made prospective)
 
 
 [28]
 NWA did not have to languish on the legal sidelines awaiting the 1978 culmination of the Manhart litigation. Manhart scarcely enunciated for the first time a principle that, save for its footnote 39, would have theretofore been unsupportable in Title VII law or theory. As we previously indicated, Manhart in this particular respect broke no new legal ground, but instead observed the possible effects of the well-established "make whole" principle in the setting of that case
 
 
 [29]
 It further appears from the record that NWA considered the district court's 1974 Remedial Order to be a final judgment. See R. 161 (NWA Notice of Appeal from "[t]he final judgment entered in this action on May 20, 1974...."), R. 160, R. 164 (NWA supersedeas bond entered in its appeal from the May 20, 1974 "final judgment")
 
 
 [30]
 At most, NWA can argue that Manhart expressly mandates "equitable sensitivity" in fashioning back-pay awards. This principle does not embody some novel and independent requirement, but rather is aimed at ensuring the fidelity of the lower federal courts in shaping equitable decrees to implement fully the paramount Title VII "make whole" principle
 
 
 [31]
 The 1982 Order defines the Title VII class as "all female cabin attendants employed by the Company at any time on or after January 29, 1970 (and certain other female cabin attendants who are to be treated as eligible ... by reason of detrimental reliance on certain class notices), except for those female cabin attendants who filed timely written elections ... to be excluded...." J.R.E. 202
 
 
 [32]
 Appellees' Reply Brief at 60-62 (discussing appellees' argument to district court regarding the December 1980 order, R. 31 at 5-12)
 
 
 [33]
 Appellees' Reply Brief at 63-64 (citing, inter alia, Paxton v. Union National Bank, 688 F.2d 552, 563 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); Alexander v. Aero Lodge No. 735, Intern. Ass'n, 565 F.2d 1364, 1372 (6th Cir.1977), cert. denied, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978); Robinson v. Lorillard Corp., 444 F.2d 791, 801-02 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)
 
 
 [34]
 In light of our conclusion in this respect, we do not have to reach, nor do we, the specific question addressed in decisions from other Courts of Appeals, such as Lorillard
 
 
 [35]
 Appellees contend that neither state has a governmental interest or statutory policy that is relevant because this is a federal claim that no state has any legitimate interest in regulating substantively. But at the time of Laffey I there was a federal limit on liability and this court, though it found the federal limit itself inapplicable, did not decide that backpay should be awarded back to the effective date of Title VII, as appellees here then contended. Instead, Laffey I found that federal policy required that a relevant state limitation should be found. The state does not regulate the federal claims; the federal common law does, and it does so by constituting itself from analogous state law
 
 
 [36]
 See Laffey I, 567 F.2d at 463-65 & n. 25 (quoting and discussing section 11 of the Portal to Portal Act of 1947, 29 U.S.C. Sec. 260 (1982))
 
 
 [37]
 See also Appellant's [NWA] Combined Reply Brief and Brief on Cross-Appeal at 58-59, Laffey I (arguing that to rebut NWA's proof in support of its alleged good faith, plaintiffs had to point to "direct evidence of bad faith or deliberate [Equal Pay Act] wrong, or that sex was consciously the rate basis, or that employer was trying to evade the [Equal Pay Act]")
 
 
 [38]
 The fifth factor cited by the district court was "the absence of any clear legal precedent or guideline precisely in point." 1974 Remedial Order, 374 F.Supp. at 1390. We recognized that this factor was indeed relevant to a determination whether an employer had a good faith, reasonably grounded (but erroneous) belief that his conduct was lawful. But "legal uncertainty," we added, "to assist the employer's defense, must pervade and markedly influence the employer's belief; merely that the law is uncertain does not suffice." Laffey I, 567 F.2d at 466. We indicated that on remand it would be appropriate for the district court to consider whether "the absence of precise legal guidelines" was in fact the "condition [that] actually led NWA to believe that it was in compliance with the Equal Pay Act." Id. The district court did so and concluded: "[NWA] was in the position to study and know the nature of the work being performed by its employees. For it to erroneously conclude that the jobs were different was not a consequence of legal uncertainty." Nov. 21, 1980, Decision, 24 Empl.Prac.Dec. at 18,286 (emphasis in original)
 
 
 [39]
 Cf. Laffey I, 567 F.2d at 466 n. 276 (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 422, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975) (Title VII decision) for proposition that maintenance of practice of "highly questionable legality" constitutes bad faith)
 
 
 [40]
 NWA refers to its "thorough" internal review of the possible application of the Equal Pay Act to the Company's personnel practices as indicative of its "good faith" and "reasonable grounds." See NWA Brief at 72; see also Nov. 21, 1980, Decision, 24 Empl.Prac.Dec. at 18,285-86 (summarizing NWA's contentions). This review consisted of conversations shortly after the Act's passage among Robert Ebert, Vice President for Personnel, James Abbott, Labor Relations Counsel (Personnel Department), and Homer Kinney, Director of Labor Relations (Personnel Department). See 12/20/78 Deposition of Homer R. Kinney at 4-7, reprinted in Supplemental Record Excerpts (S.R.E.), Vol. I; 12/19/78 Deposition of James A. Abbott at 56, reprinted in S.R.E., Vol. I. No participant asserted that he in fact recalled discussing the differences in duties between pursers and stewardesses. See 12/20/78 Deposition of Homer R. Kinney at 4-7, 42-43; 12/19/78 Deposition of James A. Abbott at 56-57, 62-63, 66-67. Nor does it appear that the officials in question were best-positioned to conduct a close review of the work of pursers and stewardesses. See Laffey I Joint Appendix at 723-24, 734-36 (trial testimony of Chester L. Stewart) (chain of direct supervision of pursers and stewardesses ran through Department of Transportation Services, not Personnel Department); id. at 897 (trial testimony of Robert Ebert) (he had only general, not detailed knowledge of purser and stewardess duties)
 
 
 [41]
 The district court quoted and added emphasis to the United States Department of Labor, Wage-Hour Administrator, Interpretive Bulletin on Equal Pay for Equal Work Sec. 800.106 (Apr. 25, 1964), which states:
 [W]here equal work is being performed within the meaning of the statute, a wage rate differential which exists between male and female employees cannot be justified on the ground that it is a result of negotiation by the union with the employer, for negotiation of such a discriminatory wage differential is prohibited under the terms of the equal pay amendment.
 Reprinted in 29 C.F.R. Sec. 800.106 (1983). The district court appropriately rejected NWA's various attempts to cloud this clear statement. See Nov. 21, 1980, Decision, 24 Empl.Prac.Dec. at 18,286 (citing Clifton D. Mayhew, Inc. v. Wirtz, 413 F.2d 658, 663 (4th Cir.1969)) ("If [employer] did not know, it was because he did not look, or looking, did not see, or want to see what was so plainly there.").
 
 
 [42]
 Nor, in light of the record as a whole, did NWA's conduct after the commencement of litigation impel any finding that "good faith" and "reasonable grounds" supported NWA's 1970-1976 retention of the sex-based pay differential. See infra pp. 1098-1099 (differential maintained for two years following district court declaration that it violated the Equal Pay Act)
 
 
 [43]
 We have described the "good faith" inquiry--did the employer honestly intend to ascertain and act in accordance with Equal Pay Act requirements--as "subjective," and the "reasonable grounds" inquiry as "objective." Laffey I, 567 F.2d at 464. If theoretically discrete, the two inquiries are not so readily compartmentalized in practical application. Inquiry into the subjective state of mind of the employer, if we attribute rationality to that employer, is likely to be influenced by the fact trier's perception whether a reasonable person, diligently seeking to conform his or her conduct to legal requirements, might have acted as the employer in fact did
 NWA now argues for rigid separation of "good faith" from "reasonable grounds" and incorrectly reads our Laffey I opinion to leave untouched the district court's original finding of good faith. See NWA Brief at 20, 72 n.*. We note, however, that NWA itself has exhibited less than perfect consistency in deciding whether to characterize a factor as relevant to "good faith" or to "reasonable grounds." Compare Appellant's [NWA] Combined Reply Brief and Brief on Cross-Appeal at 54-55, Laffey I (arguing that collective bargaining history and stewardess acquiescence demonstrated NWA acted in good faith), with NWA Brief at 72 n.* (arguing that, when Laffey I rejected these factors, the court addressed only "reasonableness," not "good faith").
 
 
 [44]
 This contract, effective January 31, 1976, and applicable to the years 1974-1977, merged all cabin attendants into a single classification. See NWA Brief at 11 n.*
 
 
 [45]
 The district court's April 1974 Remedial Order, 374 F.Supp. at 1385, provided that backpay would continue to accrue until NWA equalized purser and stewardess wages. This Order was stayed pending NWA's appeal, petition for rehearing, and petition for certiorari. See supra p. 1075
 
 
 [46]
 The district court correctly observed, see Oct. 25, 1982, Mem.Op. at 282-283, reprinted in J.R.E. 185-86, that the right to liquidated damages is nonwaivable by employees, see Schulte v. Gangi, 328 U.S. 108, 114, 66 S.Ct. 925, 928, 90 L.Ed. 1114 (1946); Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 900, 89 L.Ed. 1296 (1945), and that a union, in collective bargaining, cannot surrender rights secured by the Equal Pay Act. See 29 U.S.C. Sec. 206(d)(2) (1982); EEOC v. AT & T Co., 365 F.Supp. 1105, 1128 (E.D.Pa.1973), aff'd in relevant part, 506 F.2d 735 (3d Cir.1974) (without discussion of this point). Thus airline industry collective bargaining patterns, see supra p. ----, provide no insulation to NWA against the full measure of recovery Congress specified for Equal Pay Act violations
 We further note our agreement with the district court's remarks on a Fair Labor Standards Act regulation cited by NWA, 29 C.F.R. Sec. 778.303 (1983) (employer who grants retroactive pay increase must also increase overtime pay retroactively). This regulation serves to insure employees' receipt of overtime compensation on retroactive pay increases; it is not addressed to situations involving an "underlying unlawful differential in wages" or any other delinquency in meeting statutory obligations. See Oct. 25, 1982, Mem.Op. at 283-284, reprinted in J.R.E. 187-88.
 
 
 [47]
 The provision on which NWA relies states that "[i]n every case where [the negotiation procedures of the Act have come into play], rates of pay, rules, or working conditions shall not be altered by the carrier [until the Act's negotiation procedures have run their course]." 45 U.S.C. Sec. 156 (1982)
 
 
 [48]
 We note in this context the specific command directed to unions in the Equal Pay Act:
 No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of [the Equal Pay Act].
 29 U.S.C. Sec. 206(d)(2) (1982). See also, e.g., Boys Markets, Inc. v. Retail Clerks Union Local 770, 398 U.S. 235, 249-53, 90 S.Ct. 1583, 1591-1594, 26 L.Ed.2d 199 (1970) (to advance objectives of other legislation, court may sanction exception to Norris LaGuardia Act that does not undermine that Act's purposes); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 39-42, 77 S.Ct. 635, 639-641, 1 L.Ed.2d 622 (1957) (same); Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 168-69 (2d Cir.1975) (Railway Labor Act's unilateral wage change prohibition does not block trustee's unilateral change made to keep bankrupt operating), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976).
 
 
 [49]
 See, e.g., NLRB v. Katz, 369 U.S. 736, 743, 745-47, 82 S.Ct. 1107, 1111, 1112-14, 8 L.Ed.2d 230 (1962) (employer's unilateral change in wages under negotiation violates Sec. 8(a)(5) of the National Labor Relations Act)
 
 
 [50]
 See Standard Candy Co., 147 NLRB 1070, 1073 (1964) (ALJ opinion adopted by Board) (unilateral change in wages to comply with Fair Labor Standards Act does not violate Sec. 8(a)(5) of the National Labor Relations Act); Southern Transport, Inc., 145 NLRB 615, 617-18 (1963) (Board opinion) (same); cf. EEOC v. AT & T Co., 365 F.Supp. 1105, 1129 (E.D.Pa.1973) (unilateral changes in provisions of currently binding contract to conform with Title VII or Equal Pay Act do not violate National Labor Relations Act), aff'd in relevant part, 506 F.2d 735 (3d Cir.1974) (without discussion of this point)
 
 
 [51]
 Moreover, the district court did not hold, as appellant argues, that Northwest's longevity system was a bona fide seniority system. Absent such a conclusion, there is no basis whatever for application of the Court's decisions in Teamsters and Evans